## EDMUND BRIGGS & another *vs.* A LIGHT BOAT.

Under a contract to build three light vessels for the United States, and to deliver them completed within a fixed time, and to be governed during the progress of the building of them by the directions of an agent of the United States, and to perform the work to his satisfaction, for a price to be paid after their completion, with a provision that the United States may at any time declare the contract null, no title to the vessels passes to the United States until their completion and delivery, and a lien exists and may be enforced upon one of them in favor of a person who has furnished to their builder timber which has been used in its construction, although by the contract under which the timber was furnished no specific portion of it was designated or appropriated for either of the vessels; and the United States, by accepting the vessels upon their completion, take a title subject to the lien.

A light boat built and adapted to be used as a floating light is a vessel upon which a lien for materials furnished may attach, under Gen. Sts. *c.* 151, § 12.

The city ordinance of New Bedford, prohibiting the sale of any timber brought into the city for sale, without a survey, does not apply to timber delivered there to be used for a specific purpose under a special contract made elsewhere.

PETITION, dated August 5, 1863, for the enforcement of a lien upon a vessel. The United States appeared as claimants, and filed a plea to the jurisdiction, which was overruled, and thereupon filed an answer, insisting among other things that the vessel was the public property of the United States, and not subject to this process.

At the trial in the superior court, before *Ames*, J., it appeared that by an oral contract, made at Norton, the petitioners agreed with Stephen Andrews to furnish timber for three light boats which he was building at New Bedford for the United States that the timber was bought as round timber, and was to be sawed at Norton and sent to New Bedford; and that there was no precise agreement as to the price. The timber was accordingly delivered, and used in the construction of the light boats, about one third in each.

The contract between Andrews and an agent of the United States, under which the light boats were built, was put in evidence, and the material portions of it were as follows :

" The party of the first part, in consideration of the matters hereinafter referred to and set out, and of the specifications attached hereto and forming a part of this contract, covenants and agrees to and with the party of the second part to construct and equip three light vessels fully complete, and furnish them and each of them with tackle, apparel and furniture according to the plans, drawings and specifications hereto attached and made a part of this contract, and deliver the same so constructed, completed and furnished to the duly authorized agent of the light-house board, at the port of New Bedford, state of Massachusetts, within the period of four calendar months from the date of this agreement.

"And the said party of the first part hereby agrees to be governed and controlled, during the progress of the building of said vessels, by the supervisory instructions and directions of the superintendent of construction appointed by the light-house board, and to perform the said work of construction and equipment in a workmanlike manner, and to the satisfaction and approval of the said superintendent of construction. . . . . . .

"And the party of the second part covenants and agrees to pay to the party of the first part, in consideration of the premises and of the faithful performance of each and all of the foregoing stipulations, the sum of forty-seven thousand five hundred dollars, upon the presentation of a written certificate from the superintendent of construction to the effect that the said vessels have been constructed, furnished, fitted and completed to his satisfaction and approval, and in accordance with this agreement. . . . . . .

" Provided, however, that in case the party of the second part shall at any time be of opinion that this contract is not duly complied with by the party of the first part, or that it is not in due progress of execution, or that the said party of the first part is irregular or negligent, in such case he, the said party of the second part, shall be authorized to declare this contract forfeited,

and thereupon the same shall become null, and the party of the first part shall have no appeal from the opinion and decision aforesaid; and the right to except to or question the same in any place or under any circumstances whatever is hereby released by the party of the first part; but the party of the first part shall remain liable to the party of the second part for the damages occasioned to him by the said non-compliance, irregularity or negligence."

Jacob K. Vaughn testified that he was appointed by the light-house board to superintend the construction of these vessels, which were intended to be used as floating lights in the Potomac River; that he accordingly went to New Bedford, and the work went on under his superintendence; that the timber, some of which came from the petitioners and some from other persons, was piled up in the yard without being kept separate; that the vessels were constructed with an additional keel, called a bilge keel, on each side, to prevent rolling; that all the between decks was taken up with the accommodations for the men, and for the storage of oil, &c.; that the hold was very small, and principally taken up by the water tanks and magazine; that the vessel was schooner-rigged, with a try-sail mast about four feet abaft of the mainmast; that she was of about one hundred and fifty tons burden, with a very short bowsprit; that she carried very much less canvas than is usual for vessels of that size; that the mainmast had a lantern built about it after she was finished, with a windlass and hoisting apparatus; that the anchors and chains were much heavier and more numerous than is usual in ordinary vessels; that such vessels are usually towed, if going any distance; that they can, however, navigate, and would make good fishing vessels; that they were built according to contract, and on the 20th of June 1863 he gave Andrews a written certificate that they were so completed; and that this vessel on the 5th of August had her crew and provisions on board, with ammunition, and preparations were making for getting her armament on board. He also testified that vessels for ordinary purposes would not be built so heavy as these were, and that, to alter these into carrying vessels, it

would be necessary to take off the bilge keels, to take out about half of the between decks, to remove the try-sail mast and the lantern and all the anchors and chains but two in each.

The timber was not surveyed by any sworn surveyor; and a city ordinance of the city of New Bedford was read in evidence, prohibiting any sale or purchase of "any lumber or timber brought into the city of New Bedford for sale, unless it shall be surveyed" by a sworn surveyor, in conformity to certain provisions as therein set forth. It was objected that the petitioners were not entitled to a lien for any timber sold by them without having been first duly surveyed; and that the materials furnished were for the three vessels collectively, and not specifically for this vessel.

The judge ruled that so much of the materials furnished as was used and appropriated for this vessel might properly be considered as furnished for and on account of her; but that, as it appeared that she was built for the United States, under the inspection and superintendence of their agent, for a special and peculiar public use, and not adapted without alteration to general use, that she had been accepted by the United States and was in their possession, that she had been provided by the United States with a fixed lantern and apparatus to answer the purpose of a light boat, with her crew and provisions on board, and that arrangements were in progress to get her armament on board, and to remove her to her place of destination, she was not legally liable to be held and sold under this process. He therefore directed a verdict for the respondents, which was rendered accordingly, and reported the case for the determination of this court.

*T. D. Eliot & T. M. Stetson,* for the petitioners. This is a statute lien, and the statute contains no exception of the nature contended for. Gen. Sts. *c.* 151, § 12. The proceeding is not against the United States. *The Revenue Cutter No.* 1, 21 Law Reporter, 281. Other liens exist upon property purchased by the government. [See cases cited in the opinion.] The petitioners did not contract with the government. When the lien accrued, Andrews owned the vessel. *Choteau* v. *Thompson,*

7 Ohio, 424. *The Revenue Cutter No.* 1, *ubi supra. Andrews*
v. *Durant,* 1 Kernan, 35. *Low* v. *Austin,* 20 N. Y. 181. *Muck-low* v. *Mangles,* 1 Taunt. 318. 2 Kent Com. (6th ed.) 504,
note *c.* Long on Sales, (Rand's ed.) 287. Property purchased
by a government remains subject to existing liens and incum-
brances. The proposed public character of the property creates
no exemption. *The Revenue Cutter No.* 1, *ubi supra. United
States* v. *Wilder,* 3 Sumner, 308. *The Laurel,* 1 Newberry, 273.
*The St. Jago de Cuba,* 9 Wheat. 416. 1 Parsons Mar. Law, 501.
Curtis on Merchant Seamen, 317. Light boats are not ships of
war. Their officers are civil officers. They are not aggressive
vessels. They do not represent the sovereignty of the govern-
ment, as a ship of war does. The lien therefore attaches, and
will follow the property in spite of conveyances. *The Young
Mechanic,* 2 Curtis C. C. 404. This vessel had not gone into
public use, or become an instrumentality of the government;
but was in the shipyard of the builders. The materials may
properly be regarded as having been furnished for this particular
vessel. *Tyler* v. *Currier,* 13 Gray, 134. *The Kiersarge,* 2 Cur-
tis C. C. 421; S. C. Ware, (2d ed.) 555. *Wilson* v. *Forder,*
30 Penn. State R. 129. *Butler* v. *Rivers,* 4 R. I. 38. *People's
Ferry Co.* v. *Beers,* 20 How. (U. S.) 394.

*R. H. Dana, Jr. & T. K. Lothrop,* for the United States. By
the contract, this property vested in the government as fast as
its construction proceeded. *St.* of U. S. of 1852, *c.* 112, §§ 8–15.
Treasury Regulations of 1857, *c.* 13, §§ 1007–1135. The pecu-
liar character of the structure, and the fact that it was built
under the care of an agent of the government, show that An-
drews so understood it. This property was public property of
the United States, and held for public uses. Courts will not
detain such property to answer the claim of a private person.
*The Prinz Frederik,* 2 Dod. 451, 464. *The Alexander,* Ib. 37.
*The Schooner Exchange* v. *M'Faddon,* 7 Cranch, 116. *Wilson*
v. *The Commissioners,* 7 Watts & S. 197. *Williams* v. *The Con-
trollers,* 18 Penn. State R. 277. *Hopkins v. Stockton,* 2 Watts
& S. 163. *The Santissima Trinidad,* 7 Wheat. 283. It was
one of the instrumentalities of government, and cannot be

seized for the purpose of coercing the government. A lien is only a privilege, or mode of coercing payment; a remedial process. It is not property in any sense, and cannot be taxed or attached. The petitioners did not take possession of this property till it had passed into the possession of the government. If under this state of things the seizing and selling of the property will interfere with the public right, the privilege of the lien is suspended, and the petitioners cannot dispossess the United States. The language of the statute does not require this construction. If it did, it would to this extent be unconstitutional. *M'Culloch* v. *Maryland,* 4 Wheat. 316. *Osborn* v. *Bank of United States,* 9 Wheat. 738. *Passenger Cases,* 7 How. (U. S.) 283.

This structure is not a vessel, within the meaning of the statute. The materials in question were not furnished specifically to be used in the construction of this property, and therefore no lien for their price exists upon it. *Rogers* v. *Currier,* 13 Gray, 129. *The Young Sam,* 20 Law Reporter, 608. *Houghton* v. *Blake,* 5 California, 240. Nor were the materials delivered according to law. Gen. Sts. *c.* 49, §§ 131, 140. City Ordinances of New Bedford, *c.* 8.

BIGELOW, C. J. Upon established principles of law, we think it clear that no property in the vessel, which is the subject of controversy in this action, vested in the United States until the vessel was completed and delivered, in pursuance of the contract with the builder. The general rule of law is well settled and familiar, that, under a contract for building a ship or making any other chattel, not subsisting in specie at the time of the contract, no property vests in the purchaser during the progress of the work, nor until the vessel or other chattel is finished and ready for delivery. To this rule there are exceptions, founded for the most part on express stipulations in contracts, by which the property is held to vest in the purchaser from time to time as the work goes on. It is doubtless true that a particular agreement in a contract concerning the mode or time of making payment of the purchase money, or providing for the appointment of a superintendent of the work, may have an important

bearing in determining the question whether the property passes. to the purchaser before the completion of the chattel. It is, however, erroneous to say, as is sometimes stated by text writers, that an agreement to pay the purchase money in instalments, as certain stages of the work are completed, or a stipulation for the employment of a superintendent by the purchaser to overlook the work, and see that it is done according to the tenor of the contract, will of itself operate to vest the title in the person for whom the chattel is intended. Such stipulations may be very significant, as indicating the intention of the parties, but they are not in all cases decisive. Both of them may co-exist in a particular case, and yet the property may remain in the builder or manufacturer. Even in England, where the cases go the farthest in holding that property in a chattel in the course of construction under a contract passes to and vests in the purchaser, these stipulations are not always deemed to be conclusive of title in him. It is a question of intent, arising on the interpretation of the entire contract in each case. If, taking all the stipulations together, it is clear that the parties intended that the property should vest in the purchaser during the progress of the work and before its completion, effect will be given to such intention, and the property will be held to pass accordingly; but, on the other hand, it will not be deemed to have passed out of the builder, unless such intent is clearly manifested, but the general rule of law will prevail. *Wood* v. *Bell*, 5 El. & Bl. 772, 792, and cases cited; S. C. 6 Ib. 355. *Andrews* v. *Durant*, 1 Kernan, 35. *Williams* v. *Jackman*, 16 Gray . By the terms of the contract with the United States under which the vessel in controversy was constructed, no intention is indicated which takes this case out of the general rule. On the contrary, there are several stipulations which clearly show a different intention. In the first place, the purchase money was not payable by instalments, in proportion to the labor and materials supplied from time to time during the progress of the work, but the builder was to receive the whole sum agreed to be paid for the construction of the vessel upon its completion and acceptance by the United States. The contract

was an entire one. The fulfilment of it by the vendor was a condition precedent to his right to receive any portion of the stipulated price. In the next place, there was no absolute agreement by the United States to appoint a superintendent or supervisor of the work to regulate and control it during its progress. It was left at the option of the government to provide for such superintendence or supervision, if they saw fit to do so. If they did make such provision, the builder agreed to be bound by such directions as might be given to him by the agent so employed. This was the extent of the obligation upon this point assumed by the United States. Another and decisive indication of the intention of the parties that no property was to pass until the completion and acceptance of the vessel is found in that clause of the contract by which it is stipulated that if the agent of the United States at any time during the construction of the vessel should be of opinion that the contract was not duly complied with, or that due progress was not made in its execution, or if the builder was negligent or careless, he might declare the contract to be forfeited, and thereupon the same should become null and void. Such a reservation is inconsistent with the acquisition of any title by the United States in the unfinished vessel. It is unreasonable to suppose that the parties intended to insert a stipulation the effect of which would be that the government would acquire a right of property in the vessel under a contract which they might at any time rescind. The only reasonable interpretation of this stipulation, taken in connection with other parts of the agreement already referred to, is, that the title to the vessel was not to pass out of the builder until it was finished and accepted by the United States, and thereupon the right to the purchase money would become fixed and absolute. The builder was not to part with his property till he received compensation; the government was not bound to accept the vessel unless it conformed in all respects to the contract.

As a necessary consequence of this view of the rights of the respective parties under the contract for the construction of the vessel, it would seem to follow, unless some peculiar privilege or prerogative of the government can be interposed to prevent

it, that under the statutes of this commonwealth, Gen. Sts. *c.* 151, § 12, creating a lien for materials furnished for the construction of ships and vessels, the plaintiffs have a right to maintain this process to enforce their claim for timber furnished to the builder.   The enactment is explicit, that when money is due to a person for materials furnished in the construction of a ship or vessel by virtue of a contract either expressed or implied with the owner thereof, " such person shall have a lien upon the ship or vessel, her tackle, apparel and furniture, to secure the payment of such debt."   On the uncontradicted evidence in the case, it appears that the timber was furnished under a contract with the builder and owner, which embraced that which was intended for the specific vessel on which the lien is now claimed, and which was actually used in her construction.   It is true that by the contract no specific part or portion of the timber was designated or appropriated for each of the three vessels for which the petitioner agreed to furnish materials.   But this is quite immaterial. The legal effect of the contract was to allow the builder to elect on which of the three vessels he would use the timber supplied under the contract or any part thereof.   When thus appropriated by him, it was within the terms of the statute furnished in the construction of the vessel on which it was used, and so entitled the petitioner to a lien thereon for the price.   *The Kiersarge*, 2 Curtis C. C. 421, 425.   *Rogers* v. *Currier*, 13 Gray, 129. *Barstow* v. *Robinson*, 2 Allen, 605, and cases cited.

Nor can there be any doubt of the nature or extent of the right or interest which this statute lien is intended to create for the benefit of material men in the ship or vessel for which timber or other articles are furnished.   The word " lien," as applied to ships or vessels, has a well settled and fixed meaning in maritime and commercial law.   In this sense, according to the rule of interpretation prescribed in Gen. Sts. *c.* 3, § 7, *cl.* 1, it is to be understood and construed as used in the statute conferring the right of lien on ships and vessels.   A maritime lien is not a mere right or remedy by which persons entitled to it can enforce a claim or debt due from the owners against their vessels.   It is something more than a *jus ad rem*.   It is a *jus in re* — a right in

the nature of a title, which when enforced and perfected takes effect and transfers the property in the vessel from the time when the lien first attached. The doctrine on this subject is so fully and elaborately discussed, and illustrated with such affluence of learning, in the case of *The Young Mechanic*, 2 Curtis C. C. 404, as to render any further elucidation of it superfluous. The rule of law is there stated to be that a maritime lien "is an appropriation made by the law of a particular thing, as security for a debt or claim; the law creating an incumbrance thereon, and vesting in the creditor what we term a special property in the thing, which subsists from the moment when the debt or claim arises, and accompanies the thing even into the hands of a purchaser." Under this rule, upon the facts stated in the report, it is clear that the plaintiffs by virtue of the statute lien acquired a right in the vessel for which they furnished timber under the contract, which on due proceedings had will pass a title to the vessel in controversy paramount to any subsequently acquired by purchase or otherwise, unless there is some principle of law or public policy which will prevent them from asserting their lien and enforcing their right under it to sell the vessel as against the United States, who now appear as claimants. Upon careful consideration of this ground of defence to the petitioners' claim, we have been unable to discover any valid reason for the immunity which is set up in favor of the government. No authority has been cited which gives any countenance to the doctrine that the rules of law applicable to maritime and other liens are suspended or inoperative in cases where a ship or vessel against which they are sought to be enforced is in process of construction under a contract with the government, by the terms of which no title in the ship or vessel has passed out of the builder at the time when the articles for which a lien is claimed were furnished. And such a doctrine seems to be inconsistent with elementary principles. If the property in the ship or vessel is not changed, if it still remains in the builder, it is difficult to see how the use or purpose for which a ship or vessel is destined when completed can in any way interfere with or control the right of the owner to dispose of it while the title and possession

are both vested in him. The *jus disponendi* is inseparable from the *jus proprietatis*. It would be an anomaly in the law if a mere executory agreement for the construction of a chattel should be allowed to operate so as to take away the usual incidents which the law attaches to the ownership of personal property. If such a doctrine is applicable at all to contracts entered into with the government, it certainly cannot be limited in its operation so as to deprive the owner only of a right to create a lien on his ship or vessel. By parity of reasoning it must go to the extent of denying his right to do any act or thing in relation to the property, which is the subject of the contract, inconsistent with its terms and the rights of the government under it. If he cannot create a lien, he cannot make a valid mortgage or pledge of the property; a result which is manifestly as irreconcilable with sound principles as it is inconsistent with all the analogies of the law. The truth is, that when the government becomes the purchaser of property, it takes the title subject to the same rules as those which regulate the transfer of it to private persons. If it is subject to liens or incumbrances, it passes *cum onere*. So it is held in cases of ordinary maritime liens. If the government becomes the owner of a vessel by purchase, forfeiture or otherwise, it takes a title subject to the same liens for salvage, wages, bottomry and other claims as would attach to it if sold to private persons. *United States* v. *Wilder*, 3 Sumner, 314. *The St. Jago de Cuba*, 9 Wheat. 416. *The Copenhagen*, 1 C. Rob. Adm. 289.

If this were a suit brought by the builders to enforce a lien for materials furnished for the construction of a ship under a contract directly with the government, or for repairs on a public vessel, the title of which was vested in the United States at the time the work was done or the supplies were furnished, the argument founded on public policy, and the suggestions arising from the inconvenience of causing delay and embarrassment to the public service would be entitled to very great weight. It might in such case be open to grave doubt whether a lien on the property of the United States could be given by virtue of an enactment of the legislature of a state, or whether services rendered and

materials supplied directly to the government must not be presumed to have been furnished exclusively on the faith and credit of the United States, to the exclusion of any intent to rely on a lien upon the public property. But considerations of this nature have no application to a case like the present. It would have been competent for the United States, if they wished to avoid the inconvenience or danger of delay arising from liens in favor of private persons, to make their contract in such form as to divest the builder of any title to the property in the vessel during the process of construction, or to stipulate for the application of the purchase money to the extinguishment of all claims for materials furnished to the builder. But under the contract into which they entered, for the reasons already given, we can see no valid ground for refusing the claim of the petitioners to enforce their lien on the vessel in controversy. See *The Revenue Cutter No.* 1, 21 Law Reporter, 281.

It was suggested, but not strenuously urged, that the structure for which the petitioners furnished timber was not a ship or vessel within the meaning or reason of the statute. It is called a vessel in the contract under which it is claimed by the United States, and in all essential particulars it corresponds with the usual definition of the word as applied to structures designed for use on the water. In a nautical sense, the word is "a general name given to the different sorts of crafts which are navigated." Worcester's Dict. "Vessel." We can see no reason for giving it a restricted meaning as used in the statute.

The sale of the timber was not contrary to the provisions of the ordinance of the city of New Bedford. That by-law is intended to apply only to timber brought into the city for sale, and has no application to a case like the present, where the petitioners furnished the timber under a special contract for its sale and delivery, to be used in a specific vessel.

*Verdict set aside ; judgment for the petitioners.*