American Motors Corporation, Plaintiff and Respondent, vs. City of Kenosha, Defendant and Appellant: United States of America, Intervening Plaintiff and Respondent.*

*November 8, 1956—January 7, 1957.*

* Motion for rehearing denied, with $25 costs, on March 5, 1957.

For the appellant there were briefs by *Robert V. Baker* of Kenosha, attorney, and *Aberg, Bell, Blake & Conrad* of Madison of counsel, and oral argument by *Mr. Baker, Mr. W. J. P. Aberg,* and by *Mr. Charles P. Seibold* of Madison.

For the respondent American Motors Corporation there was a brief by *La France, Thompson & Zahn* of Racine, attorneys, and *Alfred E. La France* of Racine, and *Cook, Beake, Miller, Wrock & Cross* of Detroit, Michigan, of counsel, and oral argument by *Alfred E. La France.*

For the respondent United States of America there was a brief by *Charles K. Rice,* assistant attorney general, *Lee A. Jackson, Lyle M. Turner,* and *H. Eugene Heine, Jr.,* attorneys of the department of justice, *Edward G. Minor,* United States attorney, and *Francis L. McElligott,* assistant United States attorney, and oral argument by *Mr. Minor* and *Mr. McElligott.*

MARTIN, J.   On March 27, 1951, American Motors Corporation (hereinafter called the "company") entered into a contract with the United States Government, Department of the Air Force (hereinafter called the "government") for the manufacture and supply of aircraft engines, repair and replacement parts, overhaul tools, test and ground handling equipment, and miscellaneous services and the equipment in connection therewith.   This contract, known as a "letter contract," was amended on March 18, 1952, and supplanted on August 29, 1952, by a "definitive contract."

The definitive contract contains a clause which provides in substance that upon the making of any partial payment title to all parts, materials, inventories, work in process, and nondurable tools theretofore acquired or produced by the company for the performance of the contract and properly chargeable to the contract under sound accounting practice, should forthwith vest in the government, and that title to all like property thereafter acquired or produced by the company for performance of the contract and properly chargeable as aforesaid should vest in the government forthwith upon such acquisition or production.

Subs. (d) and (e) of the partial-payments clause provide:

"(d) It is recognized that property (including, without limitation completed supplies, spare parts, drawings, information, partially completed supplies, work in process, materials, fabricated parts, and other things called for here-

in) title to which is or may hereafter become vested in the government pursuant to this clause will from time to time be used by or put in the care, custody, or possession of the contractor in connection with the performance of this contract. The contractor, either before or after receipt of notice of termination at the option of the government, may acquire or dispose of property to which title is vested in the government under this clause, upon terms approved by the contracting officer, provided, that after receipt of notice of termination, any such property that is a part of termination inventory may be acquired or disposed of only in accordance with the provisions of the termination clause of this contract and applicable laws and regulations. The agreed price (in case of acquisition by the contractor) or the proceeds received by the contractor (in case of any other disposition), shall, to the extent that such price and proceeds do not exceed the unliquidated balance of partial payments hereunder, be paid or credited to the government as the contracting officer shall direct; and such unliquidated balance shall be reduced accordingly. Current production scrap may be sold by the contractor without approval of the contracting officer but the proceeds will be applied as provided in this paragraph (d), provided that any such scrap which is a part of termination inventory may be sold only in accordance with the provisions of the termination clause of this contract and applicable laws and regulations. Upon liquidation of all partial payments hereunder or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the government under this contract or which has not been incorporated in supplies delivered to and accepted by the government under this contract and to which title has vested in the government under this clause shall vest in the contractor.

"(e) The provisions of this contract referring to 'Liability for Government-furnished Property' and any other provision of this contract defining liability for government-furnished property shall be inapplicable to property to which the government shall have acquired title solely by virtue of the provisions of this clause. The provisions of this clause shall not relieve the contractor from risk of loss or destruction of

or damage to property to which title vests in the government under the provisions hereof."

Pursuant to the contract the company manufactured aircraft engines, etc., in its plant in the city of Kenosha, acquiring a so-called "aircraft-engine inventory," consisting of raw materials, supplies, work in process, and completed parts incident to such manufacture. From time to time the company billed the government therefor and partial payments were made. The company, which also manufactured automobiles at its Kenosha plant, kept separate accounts and books with respect to the aircraft-engine inventory, physically segregated such inventory, and used it for no other purpose.

As of May 1st in the years in question appellant assessed the aircraft-engine inventory in the possession of the company, levied and collected personal-property taxes thereon. The lower court held the assessments invalid on the ground that the property in question was owned by the United States government.

There is no question that property of the federal government, in the absence of express congressional consent, is not subject to any form of state taxation.

Sec. 70.18 (1), Stats., provides in part:

"Personal property shall be assessed to the owner thereof, except that when it shall be in the charge or possession of some person other than the owner or person beneficially entitled thereto . . . it shall be assessed to the person so in charge or possession of the same."

The provisions of sec. 70.19, Stats., apply to the situation where personal property is assessed "to some person in charge or possession thereof other than the owner or person beneficially entitled thereto," giving such person in charge or possession a right of action "against the owner or person beneficially entitled to such property" for the amount of such taxes.

The question of ownership for tax purposes is one of local law. *Blair v. Commissioner* (1937), 300 U. S. 5, 57 Sup. Ct. 330, 81 L. Ed. 465. In *United States v. Allegheny County* (1944), 322 U. S. 174, 182, 64 Sup. Ct. 908, 88 L. Ed. 1209, the United States supreme court stated that state law would not be decisive of the question of *title* in the federal government, but in many instances title and ownership are two different things, as will be more particularly dealt with hereinafter. We will concede that "title" in the property here involved has vested in the government, as held in *Detroit v. Murray Corp.* (6th Cir. 1956), 234 Fed. (2d) 380, where the partial-payments clause of a contract practically identical with this was construed. We may also assume that federal law with respect to the transfer of tangible property in Wisconsin is not different than Wisconsin law, in the absence of proof to the contrary. No such proof has been made in the present case.

In *State ex rel. Wisconsin University Bldg. Corp. v. Bareis* (1950), 257 Wis. 497, 505, 44 N. W. (2d) 259, where title to the real estate in question was in the name of the corporation but the beneficial owner was the state of Wisconsin, it was held that "taxation or exemption depends not upon the legal title but on the status of the owner of the beneficial interest in the property."

In *Offutt Housing Co. v. Sarpy County* (1956), 351 U. S. 253, 261, 76 Sup. Ct. 814, 100 L. Ed. 1151, where the question was presented whether buildings erected by the corporation upon lands leased from the government were taxable by the state of Nebraska, the United States supreme court stated :

"Labeling the government as the 'owner' does not foreclose us from ascertaining the nature of the real interests created and so does not solve the problem. . . . The government may have 'title,' but only a paper title, . . ."

Similarly, in *Corliss v. Bowers* (1930), 281 U. S. 376, 378, 50 Sup. Ct. 336, 74 L. Ed. 916:

". . . taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid."

See also *Helvering v. Clifford* (1940), 309 U. S. 331, 60 Sup. Ct. 554, 84 L. Ed. 788.

We are therefore concerned only with the question whether the company or the government was the true owner of the property involved.

Under the terms of this contract the company, in its private capacity, acquires materials needed for performance of the contract. In procuring such materials it does not act as purchasing agent for the government and the government incurs no responsibility to the vendor for payment of the purchase price. If a partial payment is made, or has previously been made under the contract, title to all such property vests in the government upon its acquisition by the company.

Sub. (d) of the partial-payment clause specifically provides:

"The contractor, either before or after receipt of notice of termination at the option of the government, may *acquire or dispose of* property to which title is vested in the government under this clause, upon terms approved by the contracting officer."

It further provides for payment or credit to the government account of the amount of the "agreed price" in the case of acquisition by the company or of the proceeds in the case of "any other disposition." Thus, it appears that the company's right to acquire or dispose of the property is subject to no restriction, the only requirement being that a price for such acquisition be agreed upon with the contracting officer

and the amount involved be paid or credited to the government as the officer may direct. It is immaterial, as set forth in the stipulation of facts, that the company has never acquired or disposed of any of the property as permitted under this clause, since it is the right of the company thereunder, rather than its acts, that controls.

Current production scrap may be sold by the company without approval of the government. With respect thereto the company is the sole judge of what materials shall be scrapped, how much, to whom it shall be sold, and for what price, providing only that the proceeds be applied in accordance with the officer's direction.

Upon completion of the deliveries called for by the contract, title to all the property not delivered and accepted by the government will revert to the company.

Sub. (e) provides that the company shall have the complete "risk of loss or destruction of or damage to property to which title vests in the government under the provisions hereof."

As stated in 42 Am. Jur., Property:

"Property . . . is composed of certain constituent elements, to wit, the unrestricted right of use, enjoyment, and disposal of the particular subject of property." p. 189, sec. 4.

"Both in common parlance and in legal acceptation, he is the owner of property who, in case of its destruction, must sustain the loss of it." p. 215, sec. 37.

See also Brown, Personal Property (2d ed.), p. 6, sec. 5.

In our opinion, the unrestricted right of the company under the contract to acquire and dispose of the property and the risk of loss are elements of ownership inconsistent with the vesting of such title in the government as would render the property immune from taxation. Conceding that title was transferred, there was, however, no true transfer of ownership.

In holding to the contrary in *Detroit v. Murray Corp.*, *supra*, where an identical partial-payments clause was con-

strued, we are not satisfied that the United States court of appeals considered the provisions respecting acquisition and disposition and risk of loss, although it would appear from that opinion that arguments based on those provisions were there advanced. The court considered that the decision in *United States v. Allegheny County* (1944), 322 U. S. 174, 64 Sup. Ct. 908, 88 L. Ed. 1209, was the controlling authority; it said that all of the arguments made by the city of Detroit were rejected in the *Allegheny Case.* But that case presented no such problem as we are here confronted with. The government's ownership interest in the property assessed was established by the following facts: One of the machines was manufactured by the contractor, ten of them were furnished by the government, and the remainder were purchased by the contractor from other manufacturers; those bought or built by the contractor were inspected, accepted, and paid for by the government. The case arose when Allegheny county added the value of said machines to the contractor's previously determined assessment for *ad valorem* taxes. The United States supreme court said (p. 187):

"We have held that where private interests in property were so preponderant that all the government held was a naked title and a nominal interest, the whole value was taxable to the equitable owner. *Northern Pacific Ry. Co. v. Myers,* 172 U. S. 589; *New Brunswick v. United States,* 276 U. S. 547. But that is not the situation here, and the state has made no effort to segregate Mesta's [the contractor's] interest and tax it. The full value of the property, including the whole ownership interest, as well as whatever value proper appraisal might attribute to the leasehold, was included in Mesta's assessment."

Thus the supreme court distinguished the *Allegheny Case* from cases where the government holds only a "naked title" and the equitable ownership is in one whose interests are taxable. The *Detroit Case,* purporting to rely on the *Alle-*

*gheny Case,* does not face the issue of true ownership which is basic to the court's decision in the *Allegheny Case.*

Here the government has performed no act whatever with respect to the property in the company's possession except to make partial payments under the contract. It has not, as in the *Allegheny Case,* inspected, accepted, and paid for it. There was, indeed, no certainty at the time the assessments were made that the property so segregated would be accepted; and the contract provides that title to all such property not eventually delivered and accepted by the government should vest in the company. The only regulatory control which the government has over the property with respect to the company's right to "acquire and dispose of" it prior to delivery and acceptance, amounts to no more than supervision of the bookkeeping to see to it that the government is not charged for any of the property so acquired and disposed of. These facts are inconsistent with ownership in the government.

Counsel for the company argues that the purpose of the title-vesting provision of the contract was primarily to safeguard the government against the possibility that its property would be subject to attachment while in the possession of the company or that its right to immediate possession would be interfered with. Under 34 USCA, Navy, p. 129, sec. 582, and 41 USCA, Public Contracts, p. 194, sec. 154, the partial-payments provision in a government contract for supplies creates a lien in favor of the government which is "paramount to all other liens" on such supplies, and the government's title would be sufficient to insure against any interference with its right to possession. The right to freedom from attachment and the right of possession are rights of a secured creditor rather than incidents of ownership.

In any event, no lien for local property taxes would attach in this case because the contract requires the company to protest and litigate the levying of such taxes and provides that the company shall be promptly reimbursed by the govern-

ment for such taxes assessed against and paid by the company. And this indicates to us that it was contemplated that in some instances the property would be subject to tax.

As stated in 84 C. J. S., Taxation, pp. 381, 382, sec. 198:

". . . the state may tax private property in which the federal government may have an interest, or property the legal title to which is in the United States, but the beneficial ownership in another. . . . This immunity [of the government] rests on the sovereign right of the federal government to hold property tax free, and it grows out of the supremacy of the federal government and the necessity that it be able to deal with its own property free from any interference or embarrassment. . . .

"The immunity of federal property from state taxation is to be given a practical application so as to attain its purpose, but without unnecessary interference with the right of taxation. It is personal to the government, and is not transferable to, or to be used for, the special protection of the citizen." See also the cases cited therein.

In our opinion true ownership of the property is in the company and the assessments are therefore valid.

As to other questions raised on this appeal, we agree with the decision in *Detroit v. Murray Corp., supra.*

*By the Court.*—Judgments reversed, and causes remanded with directions to dismiss the complaints.

CURRIE, J. (*dissenting*). I must respectfully dissent from the majority opinion in this case. A grave question of constitutional law is presented in this case because we are confronted by the claim of the United States government, an intervenor in the action, that the city of Kenosha has collected a tax against property of the federal government. Ever since Mr. Chief Justice JOHN MARSHALL's famous decision in *McCulloch v. Maryland* (1819), 17 U. S. (4 Wheat.) 316, it has been the law that no state, or political subdivision thereof, can tax the property or instrumentability of the fed-

eral government unless congress has consented thereto. A clear statement of this doctrine and the underlying reason therefor is stated in *Indian Motorcycle Co. v. United States* (1931), 283 U. S. 570, 575, 51 Sup. Ct. 601, 75 L. Ed. 1277, as follows:

"It is an established principle of our constitutional system of dual government that the instrumentalities, means, and operations whereby the United States exercises its governmental powers are exempt from taxation by the states, and that the instrumentalities, means, and operations whereby the states exert the governmental powers belonging to them are equally exempt from taxation by the United States. This principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the constitution which look to the maintenance of the dual system. [Citing cases.] Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference, but is absolute."

The entire subject of intergovernment tax immunities is reviewed in an article by Professor B. U. Ratchford in 6 National Tax Journal, 305. The author points out that, while the United States supreme court in recent years has held valid many types of state and local taxation formerly held to contravene the doctrine of governmental immunity, that court has never allowed a state or local tax to be levied upon property owned by the federal government, or by an agency of it, or which bears directly upon a government activity.

If the contract in the instant case had been entered into by American Motors with the "X" corporation instead of the United States government, I would have no hesitancy in concurring in the opinion as written because of those incidents of ownership in the property in question which inured to the benefit of American Motors in spite of the fact that legal title to such property was vested in the federal government. In such a situation the past interpretation of our property-tax

statutes would be controlling and no question of federal law would be presented.

The fundamental error, as I view it, is in assuming that the liability for the tax is determinative by Wisconsin and not federal law.

The majority opinion cites *Blair v. Commissioner* (1937), 300 U. S. 5, 57 Sup. Ct. 330, 81 L. Ed. 465, as holding that in a situation such as confronts us on this appeal, Wisconsin decisions govern. That case dealt with a question of federal estate taxation. It involved no question of the immunity from a state tax on the part of the federal government, but was concerned with the interpretation of a trust instrument creating a spendthrift trust to which the government was not a party. The point at issue was whether the beneficiary of the trust could assign his interest under the trust, and under a long line of decisions this is a matter of state and not federal law. See 1 Paul, Federal Estate and Gift Taxation, p. 73, sec. 1.11.

The United States supreme court did, however, declare in *Alabama v. King & Boozer* (1941), 314 U. S. 1, 9, 10, 62 Sup. Ct. 43, 86 L. Ed. 3, 140 A. L. R. 615, that state law was determinative of the issue of who is a "purchaser" under an Alabama sales-tax statute in a case which involved the question of immunity of the federal government. This statement was repudiated in the recent case of *Kern-Limerick, Inc., v. Scurlock* (1954), 347 U. S. 110, 121, 74 Sup. Ct. 403, 98 L. Ed. 546. In such last-mentioned case the court quoted the portion of the opinion in *Alabama v. King & Boozer, supra,* indicating that state law governed, and then stated:

"Read literally, one might conclude this court was saying that a state court might interpret its tax statute so as to throw tax liability where it chose, even though it arbitrarily eliminated an exempt sovereign. *Such a conclusion as to the meaning of the quoted words would deny the long course of*

*judicial construction which establishes as a principle that the duty rests on this court to decide for itself facts or constructions upon which federal constitutional issues rest.* The quotation refers, we think, only to the power of the state court to determine who is responsible under its law for payment to the state of the exaction." (Emphasis supplied.)

A further case, which holds that the issue of whether there is an immunity from state or local taxation of property, in which the government claims an interest, presents a question of federal and not state law is *United States v. Allegheny County* (1944), 322 U. S. 174, 183, 64 Sup. Ct. 908, 88 L. Ed. 1209. This was stated in no equivocable language as follows:

"Procurement policies so settled under federal authority may not be defeated or limited by state law. The purpose of the supremacy clause was to avoid the introduction of disparities, confusions, and conflicts which would follow if the government's general authority were subject to local controls. *The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state.* [Citing cases.]" (Emphasis supplied.)

Because federal and not state law is decisive of the issue here presented, the recent decision of the United States court of appeals for the Sixth circuit in *Detroit v. Murray Corp.* (6th Cir. 1956), 234 Fed. (2d) 380, is absolutely controlling of the result here. The government subcontracts entered into by the Murray Corporation were for the manufacture of parts and assemblies required by the United States air force for the national defense, while in the instant case the government contract entered into with American Motors was for the manufacture by the latter of aircraft engines for the same government agency and for the same purpose. The Murray Corporation subcontracts contained the same partial payment

vesting-of-title clause as did the American Motors contract. In substance such clause provided that upon the making of any partial payment, title to all parts, materials, inventories, work in process, and nondurable tools theretofore acquired or produced by the contractor for the performance of the contract and properly chargeable to the contract under sound accounting practices should *forthwith vest in the government;* and title to all like property thereafter acquired or produced by the contractor for performance of the contract and properly chargeable as aforementioned should vest in the government forthwith upon such acquisition or production.

The court in *Detroit v. Murray Corp., supra,* affirmed the judgments of the United States district court awarding recovery by the corporation of local personal-property taxes paid upon materials and parts, title to which had vested in the federal government under the partial-payment clause of the subcontracts. On the issue of immunity the court strongly relied upon the case of *United States v. Allegheny County, supra,* as appears from the following extract taken from the opinion (234 Fed. (2d), p. 382) :

"Upon analysis, we think that substantially all of the arguments advanced by appellant were rejected by the supreme court in the Allegheny Case. The supreme court declared that the principle is unshaken, indeed rarely questioned, that 'possessions, institutions, and activities of the federal government itself in the absence of express congressional consent are not subject to any form of state taxation.' 322 U. S. 177, 64 S. Ct. 911."

The majority opinion herein seeks to distinguish the *Allegheny Case* from the instant one on the ground that the government in the latter has but bare legal title in the property attempted to be taxed. This totally ignores the self-evident purpose of the partial-payment clause, and certain provisions of such clauses. The contract with American Motors was entered into during the Korean conflict when

the government desperately needed aircraft engines. The government obviously wished to be sure that any materials and parts procured by American Motors for performance of the contract would not be diverted to any other purpose without its consent. Thus, if American Motors should for any reason default on its contract, the government could step in and use the materials and parts on hand toward completion of the contract. The right of control retained by the government made its ownership far more than a bare legal title.

The majority opinion quotes a statement from the opinion in *Offutt Housing Co. v. Sarpy County* (1956), 351 U. S. 253, 76 Sup. Ct. 814, 100 L. Ed. 1151, that the government may have "only a paper title," the inference being that such paper title would not confer immunity from state taxes. An examination of such case discloses that it clearly is not in point here. There, land owned by the federal government was leased to the plaintiff housing company at a nominal rental for seventy-five years under the Wherry Military Housing Act, the company to erect buildings and improvements thereon to provide adequate housing for personnel of an air force base in Nebraska. The county assessor sought to assess the improvements, fixtures, and furniture of the plaintiff as subject to state and county personal-property taxes. Two issues were presented to the United States supreme court: (1) Whether congress had consented to the state, or its subdivisions, taxing such property, and (2) if such consent were found to have been given, could the entire value of such improvements, fixtures, and furniture be taxed to plaintiff without any diminution of such value because of the government's interest therein. The majority opinion held that congress had given its consent, and this holding removed from the case the issue of immunity from tax. On the second question of valuation, the court determined that the government had merely bare legal title for purposes of security only, similar to that of a mortgagee, which did not prevent the full value being assessed against the lessee.

The applicable inference to be drawn from the majority opinion in the *Offutt Housing Co. Case,* for the purposes of the instant case, is that, if the court had not construed the Wherry Military Housing Act as granting permission to the state to tax the lessee's interest in the property, there would have been an immunity from state and local taxes.

For the reasons stated herein, and in the able memorandum opinion of the learned trial judge, the judgment should be affirmed.

---

\* Motion for rehearing denied, with $25 costs, on March 5. 1957.