TELEDYNE INDUSTRIES, INC., Respondent, v. CITY OF
MILWAUKEE, Appellant.

*No. 247. Argued October 29, 1974.—Decided November 26, 1974.*
(Also reported in 223 N. W. 2d 586.)

For the appellant there were briefs by *James B. Brennan,* city attorney, and *Walter J. Schutz,* principal assistant city attorney, and oral argument by *Mr. Schutz.*

For the respondent there was a brief by *Foley & Lardner,* and oral argument by *Timothy C. Frautchi,* all of Milwaukee.

DAY, J. This case involves the question of whether the plaintiff-respondent manufacturer was the beneficial owner of certain inventories, raw materials, purchased

Wisconsin *ad valorem* personal property tax though title to such property was in the United States government.

The city of Milwaukee levied personal property taxes against Teledyne Industries, Inc., Teledyne Wisconsin Motor Division (formerly Wisconsin Motor Division of Continental Motors Corporation) ("Teledyne") for the tax years 1967, 1968, and 1969, in the amount of $216,005.56. Teledyne paid the taxes "under protest" and brought action against the city on October 29, 1970, to recover the amounts paid, plus interest, costs and disbursements. An amended complaint was filed April 21, 1971. In its complaint Teledyne alleged that on May 1st of the years 1967, 1968, and 1969, pursuant to contracts with the United States government, it was in possession of personal property owned by the United States government. Teledyne kept this property at its manufacturing plant located at 620 East Vienna Avenue in the city of Milwaukee. Teledyne alleged that title to the property was in the United States government and the government had such other incidents of ownership that it alone could be considered the owner for purposes of the Wisconsin *ad valorem* personal property tax. For the years in question, this property was assessed by the city of Milwaukee to Teledyne; revised assessments were entered on August 15, 1969. Teledyne alleged that as a result of these assessments it was compelled to pay to the city in instalments from January 29, 1970, to October 29, 1970, the following sums: $64,872.52 for 1967; $73,623.70 for 1968; and $77,509.34 for 1969. Teledyne alleged it paid these amounts "under protest" and that on January 30, 1970, and November 5, 1970, it filed claims for refunds with the city of Milwaukee pursuant to sec. 62.25, Stats.[1]

---

[1] "62.25 **Claims and actions.** (1) CLAIMS. (a) No action shall be maintained against a city upon a claim of any kind until the claimant shall first present his claim to the council and it is disallowed in whole or in part. Failure of the council to pass upon the claim within 90 days after presentation is a disallowance. . . ."

The Milwaukee common council failed to pass upon these claims within ninety days after their presentation. This suit was commenced pursuant to sec. 74.73, for recovery of the sums paid, plus interest. Teledyne alleged the property in question was owned by the United States government and that the collection of the taxes, therefore, was unlawful.

The parties stipulated to the following facts, which appear in the record. The personal property involved (subject property) consists of inventories of raw materials, purchased parts, and goods in process, which were in possession of Teledyne subject to the terms of government contracts. On the applicable tax dates, this property was located on private property leased by Teledyne for the sole purpose of performing two contracts for the government. The two contracts were fixed-price supply contracts under which Teledyne produced specially designed gasoline engines for military uses. Contract prices on these two contracts exceeded $57,000,000 and Teledyne had approximately 800 employees working on these contracts. The tax assessments in question were assessed against Teledyne as the alleged beneficial owner of the property pursuant to sec. 70.18, Stats.,[2] and not under sec. 70.11 (8m).[3] The total amount levied against Tele-

[2] "70.18 Personal property, to whom assessed. (1) Personal property shall be assessed to the owner thereof, except that when it is in the charge or possession of some person other than the owner it may be assessed to the person so in charge or possession of the same . . ."

[3] "70.11 Property exempted from taxation. The property described in this section is exempted from general property taxes: . . .

"(8m) PROPERTY OF THE U. S. GOVERNMENT. Where property owned by the U. S. government or any of its instrumentalities is leased to, used by or in the charge or possession of a person and is used for pecuniary profit, an amount equivalent to the real and personal assessments shall be placed on the assessment roll opposite the name of such person and the taxes thereon shall become due and payable at the same time and in the same manner as

dyne for the years 1967 to 1969, inclusive, for the personal property in question was $216,005.56.

The engines produced by Teledyne pursuant to the two government contracts were unique and had no commercial counterpart because of the particular and exacting government specifications. Teledyne was required to purchase materials and components according to government specifications. For some components and materials, the government not only specified the characteristics of the items but also the manufacturer or manufacturers from whom they must be purchased. These items were specially produced by other manufacturers for these government contracts and had no commercial market or counterpart and were subject to government inspection at both the vendor's and Teledyne's facilities. To produce these engines, Teledyne used special equipment and machinery furnished to it by the government.

Legal title to the subject property vested in the government upon the date of the contracts or upon Teledyne's subsequent acquisition of the property.[4] Teledyne pur-

other property taxes. . . ." Sec. 70.11 (8m) was held invalid in *State ex rel. General Motors Corp. v. Oak Creek* (1971), 49 Wis. 2d 299, 182 N. W. 2d 481.

[4] "(d) *Title.* Immediately, upon the date of this contract, title to all parts; materials; inventories; work in process; special tooling as defined in the clause of this contract entitled 'Special Tooling;' special test equipment and other special tooling to which the Government is to acquire title pursuant to any other provision of this contract; nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids title to which is not obtained as special tooling pursuant to this paragraph; and drawings and technical data (to the extent delivery thereof to the Government is required by other provisions of this contract) ; therefore acquired or produced by the Contractor and allocated or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocated or properly chargeable to this contract as

chased the property in its own name and not as an agent of the government. All of the property in question had been partially paid for by the government pursuant to progress-payment clauses in the contracts. On each contract, periodic payments amounted to 70 percent of Teledyne's expenses to date. After the first production test had been run by the government, Teledyne could not make any change in items without prior approval of the government. If Teledyne changed suppliers after the first production test, the government had the right to conduct additional tests similar to the first production test prior to accepting any item containing the new component. The government also reserved the right to make changes in the specifications.

Teledyne had the right to acquire or dispose of the property in question with the consent of the contracting officer and on terms approved by him.[5] Teledyne could sell current production scrap but had to credit the proceeds against the costs of contract performance. The government had extensive contractual rights to inspect all of the subject property, including incoming materials, parts and supplies, goods-in-process, finished products, and Teledyne's manufacturing processes and techniques. The government could require Teledyne to conduct tests and examinations, and could inspect and supervise Tele-

aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. . . ."

[5] "With the consent of the Contracting Officer and on terms approved by him, the Contractor may acquire or dispose of property to which title is vested in the Government pursuant to this clause, and in that event, the costs allocable to the property so transferred from this contract shall be eliminated from the costs of contract performance and the Contractor shall repay to the Government (by cash or credit memorandum) an amount equal to the unliquidated progress payments allocable to the property so transferred."

The term "contracting officer" is defined in the contract as "the person executing this contract on behalf of the Government."

dyne's performance of such tests. The government could reject items or require Teledyne to make corrections if it felt they were defective or did not conform to specifications. If the government rejected an item, it had the right to give instructions to Teledyne regarding disposition of the item. If Teledyne protested rejection of an item, the action would be reviewed by a Material Review Board. This was a three-man board made up of two Teledyne employees and one government inspector. Before Teledyne could use the item in question, the board had to unanimously agree to its use.

The government had the right of access to the property in question at all times, and the government maintained, on the average, 14 full-time government inspectors on Teledyne's premises during the performance of the two contracts. In addition, government engineers came in at times to discuss technical and manufacturing problems and make suggestions. Teledyne had no use for, or right to use, the property except to manufacture it in accordance with the contracts and deliver it to the government upon completion. Teledyne leased private property in Milwaukee specifically for the purpose of performing the two government contracts and did not renew its lease after the contracts were completed. In addition, all of the property in question was kept in physically segregated areas in this leased facility.

Teledyne bore the risk of loss of the property [6] and insured against its risk of loss.

---

[6] *"Risk of Loss.* Except to the extent that the Government shall have otherwise expressly assumed the risk of loss of property, title to which vests in the Government pursuant to this clause, in the event of the loss, theft or destruction of or damage to any such property before its delivery to and acceptance by the Government, the Contractor shall bear the risk of loss and shall repay the Government an amount equal to the unliquidated progress payments based on costs allocable to such lost, stolen, destroyed or damaged property."

The government controlled the retention, removal and disposition of the property, and could terminate all or part of the contracts at any time and order Teledyne to ship the property to a location designated by the government. Finally, under the contracts, Teledyne was required to: (1) Keep detailed records for government inspection; (2) give the government unrestricted access to all its pertinent books, documents and records; (3) submit production-progress reports to the government every fifteen days; (4) maintain a special accounting system for administration of the progress-payments system; and (5) furnish other reports and information requested by the government.

The trial of the issue was to the court on the stipulated facts. The trial court issued its findings of fact and conclusions of law in which it found that Teledyne was not the beneficial owner of the subject property for tax purposes under sec. 70.18, Stats., and that the federal government was the owner of the property. The court concluded that the personal property in question was not taxable by the defendant city of Milwaukee and that Teledyne was entitled to recover the taxes unlawfully levied and collected by the city in the total amount of $216,005.56, together with interest from the respective dates of filing claims for the recovery of said taxes, *viz.* interest on $69,239.68 from January 30, 1970, and interest on $146,765.88 from November 5, 1970. Judgment was entered for the recovery of the taxes and for costs and disbursements on February 19, 1973. The city appealed from this judgment.

The trial court in its decision relied on the case of *State ex rel. General Motors Corp. v. Oak Creek* (1971), 49 Wis. 2d 299, 182 N. W. 2d 481.

Teledyne raises an issue as to the scope of this court's review of this case. Teledyne contends that the finding by the trial court that the subject property was owned by the government and not by Teledyne is a finding of

"ultimate fact" which this court may not upset unless it is against the great weight and clear preponderance of the evidence. The city on the other hand argues that the determination of ownership for property-tax purposes is a conclusion of law which may be decided by this court without giving special weight to the conclusions of the trial court.

We agree with the city on this issue and hold that the determination of who is the beneficial owner for tax purposes, where the facts are stipulated, is a conclusion of law. This court is not limited in its review by the findings of the trial court.

Teledyne argues that the question of law "is whether property owned by the Government can be taxed under the Wisconsin property tax statutes." The answer to that question, of course, is an easy one. The city cannot tax property owned by the United States government.[7] Because legal consequences flow directly from the determination of ownership, the finding of such constitutes a conclusion of law rather than a finding of ultimate fact. In this case, if Teledyne is the owner of the property it may be taxed; if the government is the owner, it may not be taxed.

---

[7] Ever since *M'Culloch v. Maryland* (1819), 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579, it has been established that no state or local government can tax federal government property without the consent of Congress. Thus, in *Indian Motorcycle Co. v. United States* (1931), 283 U. S. 570, 575, 51 Sup. Ct. 601, 75 L. Ed. 1277, the court said:

"It is an established principle of our constitutional system of dual government that the instrumentalities, means and operations whereby the United States exercises its governmental powers are exempt from taxation by the States, and that the instrumentalities, means and operations whereby the States exert the governmental powers belonging to them are equally exempt from taxation by the United States. This principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system."

In *Lorenz v. Dreske* (1974), 62 Wis. 2d 273, 280, 214 N. W. 2d 753, this court held that an allegation of "professional services" in a complaint was properly categorized as a matter of mixed law and fact, where a two-year statute of limitations expressly excepted actions for fees for professional services. Thus, this court held:

"The adjective 'professional' is a factual description but since the term is used in a statute which applies to this cause of action it may also have a legal definition which differs from other common uses of the adjective. Therefore, since legal consequences flow from the use of the term it is in a sense a conclusion of law."

Similarly, in *Browndale International v. Board of Adjustment* (1973), 60 Wis. 2d 182, 208 N. W. 2d 121, this court held that a determination of whether a home for emotionally disturbed children was a single-family dwelling under a zoning ordinance, was a question of law. The *Browndale* decision, p. 199, reiterated the rule that this court is " '. . . not bound by a finding of the trial court which is based upon the undisputed evidence when that finding is essentially a conclusion of law. . . .' " [8]

In *McGraw-Edison Co. v. ILHR Department* (1974), 64 Wis. 2d 703, 713, 221 N. W. 2d 677, an employee-misconduct case under the Unemployment Compensation Act, this court held "Any determination as to whether or not certain conduct amounts to misconduct, however, is a conclusion of law and a determination by the appeal tribunal or commission is not binding on the courts." Since the question of beneficial ownership here is a question of law, this court must look at the facts and reach its own conclusions.

---

[8] *See also: Boutelle v. Chrislaw* (1967), 34 Wis. 2d 665, 673, 150 N. W. 2d 486, where this court held that a determination, based on undisputed facts, that a broker " 'procured a purchaser' " within the meaning of a contract was a conclusion of law.

The basic question in this case is, was Teledyne the true or beneficial owner of the property in question for purposes of taxation under sec. 70.18 (1), Stats.?

We conclude that the United States government, rather than Teledyne, was in fact the beneficial owner of the personal property involved in this litigation. *State ex rel. General Motors Corp. v. Oak Creek* (1971), 49 Wis. 2d 299, 182 N. W. 2d 481. In the *General Motors Case,* this court held personal property in the possession of General Motors actually belonged to the United States government and could not be taxed as personal property of General Motors. The facts in the *General Motors Case* are sufficiently similar to those in the Teledyne case to be determinative of the issue here raised.

In *General Motors,* the corporation challenged the validity of a tax assessment made against it by the city of Oak Creek on personal property in its possession. General Motors had contracts with the government, pursuant to which it conducted research and manufacturing activities related to guidance, navigation and fire control systems. Property located at its plant as a result of these contracts included inventory items such as raw material, purchased parts, and work in process. The property is similar in nature to that involved in the Teledyne case. In Teledyne the property was not located at its own plant but on property specifically leased for the purpose of working on the government contracts and such property was abandoned once the government contracts were completed.

In *General Motors,* the city of Oak Creek contended that such property was taxable to General Motors either under sec. 70.11 (8m), Stats., or under sec. 70.18 (1). In *General Motors* the government held legal title to the property and all items were furnished either by the government or purchased at its expense. General Motors

could not use the property for nongovernmental purposes without permission and if such permission was granted, General Motors was required to pay rent for use of the property. In the present case, it is stipulated that Teledyne had no right to use the property involved except to manufacture it in accordance with the terms of the contracts. The property in the *General Motors Case* was physically located on General Motors' property but general control and dominion remained in the government, and the government had the right to inspect and remove the property at any time. In Teledyne the government could order Teledyne to move the property to any location designated by the government. In *General Motors,* as in Teledyne, the company was required to keep detailed records concerning the property. The ultimate disposition of the property was determined by the government and the contracts could be terminated by the government at will. In *General Motors,* as in Teledyne, government personnel were present in the plant at all times.

In *General Motors,* as contrasted to Teledyne, the risk of loss for damage or destruction of any property remained in the government, with the exception of losses caused by the wilful misconduct or bad faith of certain key employees. Based on these facts, this court in *General Motors,* at pages 309, 310, held:

"Aside from the profit realized under its contracts with the government, and the privilege, subject to strict government control, of renting the government property for use on nongovernmental projects, appellant's ownership interest in the property is minimal and considerably less than was required for beneficial ownership for purposes of taxation in the cases cited above."

In the Teledyne case, the risk of loss is by contract placed on Teledyne. The city of Milwaukee, both in its briefs and in oral argument, places great emphasis on

the fact that each of the contracts provides that Teledyne bear the risk of loss.

The only way the government could protect itself was to: (1) insure its own property; (2) specify the conditions under which Teledyne would be liable for loss as was done in *General Motors;* or (3) make Teledyne in effect an insurer by contracting that the risk of loss would be on Teledyne. The latter method was followed. It was stipulated that Teledyne insured the property. The fact that Teledyne was in essence an insurer of property, title to which was in the government, strengthens rather than detracts from the concept that the government is the beneficial owner as well as the legal title holder of the property in question.

*State ex rel. Superior Ship Building Co. v. Beckley* (1921), 175 Wis. 272, 185 N. W. 199, was a case involving facts similar to those in the instant case. The court there held that title was in the government for tax purposes even though the contractor bore the risk of loss. This case was not mentioned by the court in *American Motors Corp. v. Kenosha* (1957), 274 Wis. 315, 80 N. W. 2d 363, discussed below. In *Milwaukee v. Shoup Voting Machine Corp.* (1972), 54 Wis. 2d 549, 560, 196 N. W. 2d 694, this court held that the city, and not the lessor, owned certain voting machines for property-tax purposes. In reaching this conclusion, this court said:

"There is a dispute between the parties in their briefs as to who carries the insurance and who is required to. The question of insurance was not covered in the stipulation. Although the fact as to who provides insurance is an important consideration in determining beneficial ownership, it is only one of several factors to be considered and a disregard of the insurance factor does not prevent a valid determination of beneficial ownership."

Cases from other jurisdictions involving similar circumstances have held that placing the risk of loss on the

contractor is not by itself inconsistent with government ownership. *Boeing Co. v. United States* (1964), 338 Fed. 2d 342; *General Dynamics Corp. v. County of Los Angeles* (1958), 51 Cal. 2d 59, 330 Pac. 2d 794. *See also: United States v. Ansonia Brass & Copper Co.* (1910), 218 U. S. 452, 31 Sup. Ct. 49, 54 L. Ed. 1107.

The city in its brief attempts to further distinguish the *General Motors Case* by contending that the court there was dealing with sec. 70.11 (8m), Stats., and not with sec. 70.18 (1), the latter being the statutory section involved here. The city is not correct. This court considered the merits of the case under sec. 70.18 (1) and held that sec. 70.11 (8m) was a nullity because not properly enacted.

As this court stated in *General Motors* at page 329:

"In summary, we hold:
"(1) Sec. 70.18 (1), Stats., imposes an *ad valorem* personal property tax on the ownership of property, and only by disregarding the previous decisions of this court and the legislative intent can it be construed to impose a use tax in the absence of beneficial 'ownership' as defined in *American Motors Corp. v. Kenosha, supra*. Under the facts presented here appellant does not hold such indicia of ownership and cannot be taxed under this section.
"(2) Sec. 70.11 (8m), Stats., does create a use tax which did not previously exist in the statutes, and by reason of the legislature's failure to comply with the constitutional and statutory mandates for the enactment of a statute relating to taxation we must declare the statute to be a nullity."

The city of Milwaukee urges that we reverse the trial court on the basis of *American Motors Corp. v. Kenosha, supra*. In that case, this court held that the corporation, and not the government, was the beneficial owner of certain personal property on which the city of Kenosha levied a personal property tax. *American Motors* involved a contract similar to the one here, which was en-

tered into between the company and the United States Air Force (government) primarily for the manufacture and supply of aircraft engines. In fulfilling the contract of manufacture, the company acquired an inventory consisting of raw materials, supplies, work in process and completed parts. The city of Kenosha assessed the inventory and levied personal property taxes thereon pursuant to sec. 70.18 (1), Stats. The question involved in that case was whether the company was the owner of the property for personal property taxation purposes. The court in *American Motors* recognized that "title" to the property in question had vested in the government, as is true in the instant case, but stated, page 320, "in many instances title and ownership are two different things . . . ." The court then stated that the only question was whether the company or the government was the true owner of the property. The contract in *American Motors* provided that, upon making any partial payment, title to all the inventories vested in the government.

American Motors acquired the materials needed to perform the contract, acting independently and not as a purchasing agent for the government. American Motors kept the inventories involved physically segregated, kept separate books on the inventories and used the inventories for no other purpose than performance of the government contracts. These are very similar to the contract provisions in Teledyne. Also under the American Motors contract the company bore the risk of loss of the inventories. This is likewise similar to Teledyne. The American Motors' contract provided upon completion of the deliveries called for by the contract, title to all the property not delivered to and accepted by the government reverted to the company.[9] In *American Motors,* as in Teledyne, cur-

[9] The contracts involved in Teledyne contain a similar provision: "Upon completion of performance of all the obligations of the Contractor under this contract, including liquidation of all progress

rent production scrap could be sold by the company without the approval of the government. On the basis of this information, this court concluded, at page 322:

". . . the unrestricted right of the company under the contract to acquire and dispose of the property and the risk of loss are elements of ownership inconsistent with the vesting of such title in the government as would render the property immune from taxation. Conceding that title was transferred, there was, however, no true transfer of ownership."

The court found in *American Motors*, page 321, that the company had an "unrestricted" right to acquire and dispose of the property because it said the contractual provision involved imposed no restriction other than the requirement ". . . that a price for such acquisition be agreed upon with the contracting officer and the amount involved be paid or credited to the government as the officer may direct." [10]

In contrast, Teledyne had no unrestricted right to acquire or dispose of property to which title is vested in the government unless it had "the consent of the contracting officer and on terms approved by him. . . ."

In holding that *American Motors* and not the government was the true owner of the property involved, this court found, page 324:

payments hereunder, title to all property (or the proceeds thereof) which had not been delivered to, and accepted by the Government under this contract or which had not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this clause shall vest in the Contractor."

[10] Three cases from other jurisdictions have questioned this court's conclusion in *American Motors* that the company had an "unrestricted" right to acquire and dispose of the property. *Boeing Co. v. United States* (1964), 338 Fed. 2d 342; *Martin Co. v. State Tax Comm.* (1961), 225 Md. 404, 171 Atl. 2d 479; and *General Dynamics Corp. v. County of Los Angeles* (1958), 51 Cal. 2d 59, 330 Pac. 2d 794.

"... the government has performed no act whatever with respect to the property in the company's possession except to make partial payments under the contract. It has not, as in the *Allegheny Case*, inspected, accepted, and paid for it. . . . The only regulatory control which the government has over the property with respect to the company's right to 'acquire and dispose of' it prior to delivery and acceptance, amounts to no more than supervision of the bookkeeping to see to it that the government is not charged for any of the property so acquired and disposed of. These facts are inconsistent with ownership in the government."

In contrast to the limited government control and participation referred to by the court above, in Teledyne the government issued specifications covering the items and specified the vendor from whom Teledyne must purchase many of the items. The government had extensive contractual rights to inspect all of the property involved and it could require Teledyne to conduct specified tests and examinations, could supervise Teledyne's performance of these tests and examinations, had a right of access to the property at all times and maintained an average of 14 full-time government inspectors on Teledyne's premises during the performance of the contracts. It was also stipulated that the government controlled the retention, removal and disposition of the property.

The facts in the Teledyne case are more closely analogous to the *General Motors Case*. Based on the facts stipulated to by the parties, we regard the *General Motors Case* as controlling and conclude that beneficial ownership of the personal property, which is the subject of this litigation, was not in Teledyne but in the government.

*By the Court.*—Judgment affirmed.