In re VERCO INDUSTRIES, a California corporation, Debtor.

VERCO INDUSTRIES, a California corporation, Appellant,

v.

UNITED STATES of America, Appellee.

BAP No. CC–81–1241–VGH.
Bankruptcy No. SA 80–01923–PE.
Adv. No. 80–0845.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued Feb. 18, 1982.

Decided Dec. 20, 1982.

Robert A. Greenfield, Jeffrey C. Krause, Stutman, Treister & Glatt, Los Angeles, Cal., for appellant.

**616**

Kenneth Oestreicher, Dept. of Justice, Commercial Litigation Branch, Washington, D.C., for appellee.

Before VOLINN, GEORGE and HUGHES, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

### I.

### INTRODUCTORY

On July 23, 1980, Verco Industries ("Verco") filed a petition for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 1101, et seq. (hereinafter the "Code"). The United States filed proofs of claims against the Verco bankruptcy estate for breach of various contracts between it and Verco for the manufacture of equipment for agencies of the United States pursuant to military procurement contracts.

Verco objected to the proofs of claim and counterclaimed against the United States. It thereafter amended the objections and counterclaims. Count 10 of Verco's counterclaims alleged that the United States received a voidable preference during the ninety days preceding the filing of Verco's petition in bankruptcy, 11 U.S.C. § 547. Counts 11 and 12 of Verco's counterclaims alleged that the Government's claim of title to property which remained in Verco's possession was in reality a security interest which was voidable by Verco as debtor in possession, because the United States failed to perfect its interest in the property, 11 U.S.C. § 544.

Each of the contracts at issue contained title vesting clauses as follows:

"Immediately, upon the date of this contract, title to all parts; materials; inventories ... theretofore acquired or produced by the Contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by this Contractor and allocable or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation." Amended Objections to Claims and Amended Compulsory Counterclaim, ¶ 156.

Essentially, Verco contends that the unliquidated progress payments to Verco were advanced by the Government to finance the manufacture of the goods and that the transfer of title was intended to secure and provide collateral for Verco's future performance under its contracts with the Government. See ¶¶ 148 and 165 of Amended Objections to Claims and Amended Compulsory Counterclaim.

The United States moved to dismiss counts 10, 11 and 12 of Verco's counterclaims. Verco has appealed the trial court's order of dismissal.

### II.

### DISPOSITION OF THE GOVERNMENT'S CLAIMS

The United States filed three claims:

1. Claim No. 108 for $470,583.78 based on costs of reacquisition and unliquidated progress payments under the contract.

2. Claim No. 109 for $234,789 for breach of a Navy contract based on procurement costs and rental.

3. Claim No. 121 for $4,072,079 based on breach of an Army procurement contract,

Verco filed objections to the foregoing claims and filed counterclaims totalling some $7,700,000. The basis of the counterclaims was that the procurement contracts were terminated in bad faith by the United States and that the terminations were responsible for the debtor's present financial difficulties.

The court ruled that while it had jurisdiction over the claims and counterclaims under 28 U.S.C. § 1471, it considered that it would deflect jurisdiction to the Court of Claims or the Board of Contract Appeals. This was because of the expertise of these bodies in complex Government contract liti-

gation and also because of the lengthy trial which would be disruptive of the Bankruptcy Court's calendar. The court therefore concluded that this was an appropriate case for the Bankruptcy Court to abstain and deflect jurisdiction to the Court of Claims or the Board of Contract Appeals.

Insofar as the counterclaims involved invalidity of the Government's claim of superior title or interest in the subject property, or of preference, the Bankruptcy Court retained jurisdiction and ruled thereon, granting the government's motion to dismiss the counterclaims. These rulings are the subject matter of this appeal.

## III

### ISSUES

1. Do title vesting clauses in Government procurement contracts, per se, without public notice or filing, preclude other parties, such as subsequent lienholders, from asserting a superior interest in property subject to such a clause?

2. Does the increase in value of property, title to which has vested in the Government, constitute a preference if accrued within 90 days of filing the bankruptcy?

3. Does property acquired by a Government contractor during the 90-day period prior to filing bankruptcy and which would otherwise be subject to a title vesting clause, constitute a preferential transfer?

4. Is there any basis on which the applicable counterclaims of Verco may state a claim so as to warrant granting leave to amend a second time?

## IV.

### STANDARD ON MOTION TO DISMISS

■ A claim should not be dismissed for failure to state a claim unless it appears beyond doubt that the claimant can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957); *Builders Corporation of America v. United States,* 259 F.2d 766 (9th Cir. 1958). The question is whether a cause of action, construed in a light most favorable to the claimant, states any valid claim for relief. *Bryant v. California Brewers Association,* 585 F.2d 421, 425 (9th Cir.1978). Thus, dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a claimant includes allegations that show on the face of the complaint that there is an insuperable bar to relief. *Thomas W. Garland v. City of St. Louis,* 596 F.2d 784, 787 (8th Cir.1979), *cert. denied,* 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979). These are the standards this Court must apply to determine whether the motion to dismiss Verco's counterclaims was properly granted by the trial court.

## V.

### EFFECT OF THE TITLE VESTING CLAUSE

The following general principles can be derived from the case law in this area:

1. Courts consistently view the entire procurement contract to determine if any provisions are expressly inconsistent with the title vesting provision. Rarely, if ever, have courts found such inconsistent provisions.

■ 2. Federal law and not state recording laws is to be applied to determine the effect of title vesting clauses in federal procurement contracts.

■ 3. Public policy, especially in the national defense area, favors a literal interpretation of title vesting provisions in federal procurement contracts. The appellee has brought to our attention a case pertinent to this issue decided after argument of this appeal by the United States Court of Claims: *Marine Midland Bank v. U.S.,* 687 F.2d 395, 1982. This case will be discussed at page 620 below.

## VI.

### LEGAL CONSIDERATIONS

The leading case in this area is *United States v. Ansonia Brass & Copper Co.,* 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910).

In this case, creditors of an insolvent ship-building company attempted to enforce supply liens against the company and requested appointment of a receiver. Because of its importance, it will be discussed at length.

The United States contracted with William R. Trigt Company, a Virginia corporation, to build three vessels: a sea-going suction dredge called the Benyuard for the War Department, a revenue cutter, the Mohawk, for the Treasury Department, and a cruiser, and Galveston, for the Navy Department. Trigt got into financial difficulties. Various suppliers to Trigt, invoking the Virginia lien laws, asked for the appointment of a receiver who took possession of the vessels. The United States obtained release of the vessels but litigation as to the validity of the liens claims under the supply lien law of the state continued. A majority of the Virginia Supreme Court held that the liens were valid.

As to the Benyuard, the Government claimed that, under the contract, title to the dredge vested in the United States by virtue of the terms thereof. As to the Mohawk and Galveston, the Government claimed that the contract provided that no claim under state law, whether of title or lien, could be superior to the right of the Government in the vessels, and that the vessels were therefore not subject to the lien statutes of the State of Virginia.

The Court upheld the title reservation clause, as to the Benyuard, overruling the claims of lien made under the Virginia statutes. However, as to the Mohawk and the Galveston, because there was no reservation of title as to these vessels, the claims of lien under state law were upheld.

As to the Benyuard, § 211 of the contract provided "the parts paid for under the system of partial payments above specified shall become thereby the sole property of the United States; . . . ."

Despite other provisions of the contract inconsistent with title, e.g., that insurance for fire and marine risks was to be paid for by the contractor, the court ruled that such provisions did not negate or attenuate the ownership clause of § 211.

The clearest expression of the court's overview and the basic perspective of this line of cases was derived from a Massachusetts case, *Briggs v. A Light Boat,* 89 Mass. (7 Allen) 287 (1863).

In that case, the court in *dicta,* stated:

It would have been competent for the United States, if they wished to avoid the inconvenience or danger of delay arising from liens in favor of private persons to make their contract in such form as to devest the builder of any title to the property in the vessel during the process of construction.

The court in *Ansonia* adopted the foregoing language, concluding with the following unequivocal statement:

We are now treating of property which the United States owns. Such property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty against the consent of the Government, intended for public use, and could not be seized under state laws to answer the claim of a private person however meritorious.

The foregoing opinion is all the more forceful because it did allow liens to subsist against the Mohawk and Galveston which did not provide for the reservation of title, but rather for automatically superior liens on the part of the Government.

*Ansonia* has been followed frequently, see *United States v. Davies,* 152 F.2d 313 (7th Cir.1945); *Shepard Engineering Company v. United States,* 287 F.2d 737 (8th Cir. 1961); *In re American Boiler Works, Inc.,* 220 F.2d 319 (3d Cir.1955); *United States v. Digital Products Corporation,* 624 F.2d 690 (5th Cir.1980); *In re Double H Products Corporation,* 462 F.2d 52 (3d Cir.1972).

In a related area, involving taxation of property, a number of courts have ruled consistently with the foregoing opinions. These cases usually involve an attempt by a state or municipality to tax property in which title has been reserved by the United States as if it were owned by the holder thereof, subject to a secured interest on the

part of the United States. For the most part, these cases hold that where the Government reserves title, the property is not subject to taxation, see *United States v. County of Allegheny, Pennsylvania,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1943).

There are other cases applying the same doctrine in different contexts, see *Boeing Company v. United States,* 338 F.2d 342, 68 Ct.Cl. 109 (1964).

Still others have recognized the doctrine but distinguished it, see *Consolidated-Hammer Dry Plate & Film Company v. Commissioner of Internal Revenue,* 317 F.2d 829 (7th Cir.1963), and *City of Detroit v. Murray Corporation of America,* 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958).

There is a minority view contra. See *American Motors Corp. v. Kenosha,* 274 Wis. 315, 80 N.W.2d 363 (1957), aff'd *per curiam,* 356 U.S. 21, 78 S.Ct. 559, 2 L.Ed.2d 578 (1958).

## B.

Verco relies primarily on two cases to support its position. The first case is *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). This issue in *Kimbell* was whether contractual liens arising from certain federal loan programs take precedence over private liens, absent a federal statute that sets priorities. Verco apparently makes the assumption that the government holds only a security interest and not title to the property of the estate in question. Since the cases almost unanimously hold that a title vesting clause results in a transfer of ownership to the United States, this case is inapplicable. The case is also distinguishable in that it does not deal in armed services procurement, but with true loans of money with explicit security interests being transferred.

The second case is *In re Murdock Machine & Engineering Co.,* 620 F.2d 767 (10th Cir. 1980). Ramco Steel, Inc. sold steel to Murdock on credit, delivery F.O.B. Buffalo, New York. The steel was shipped to a warehouse in Indiana for reshipment to Murdock in Utah. Murdock became insolvent on May 13, 1975 which Ramco learned of on May 23, 1975, and upon hearing stopped shipment of the last shipment of steel which left the plant on May 22, 1975, Unbeknownst to Ramco, Murdock had entered into a contract with the United States to supply certain steel components for missiles. This contract contained a title vesting clause where title vested immediately upon date of the contract. Ramco filed a petition with the bankruptcy court to reclaim the steel shipped to Murdock on credit. The United States asserted its ownership interest in a counterclaim. The discussion of the court centered on whether title had vested. It found that Ramco was entitled to reclaim the steel based upon Uniform Commercial Code § 2–705. The court characterized Ramco's right to reclaim or withhold possession of the steel as a right which attached when Murdock became insolvent.

While *Murdock* initially discussed the title vesting clause in a manner which appeared to extend *Kimbell,* the case went on to analyze at length the right of stopping shipment to an insolvent purchaser, historically, and under the Uniform Commercial Code. The reasoning in *Murdock,* in order to reconcile conceptual problems relating to passage of title and imposition of a lien, emphasized that the right of stoppage *in transitu* conferred on the shipper a right or interest which was superior to that of a good faith purchaser for value. Thus, even though the Government may have received an interest by way of title upon shipment, it was nevertheless subject to the preexisting right of the unpaid shipper where the purchaser was insolvent. We are of the view that *Murdock* should be considered in its particular factual context and not as a launching pad for overturning well-established authority.

■ We therefore conclude that title vesting clauses in Government procurement contracts, although they are not filed, or recorded, and do not otherwise afford public notice of a claim of paramount interest on the part of the Government, preclude other parties such as subsequent lienholders

from asserting a prior or superior interest in property subject to such clauses, and affirm the trial court's ruling in this respect.

### C.

The case of *Marine Midland Bank, supra,* in dealing with the relative priority of the Government's claim, while maintaining the paramount position of the United States in a procurement setting, proposes a major conceptual shift from automatic title to a purchase money lien, attaching automatically and paramount under federal law to the extent of funds advanced by the Government, without the need to comply with state law for perfection. The dispute involved the claims of the bank and the United States to certain assets of Bond Trailer Division, Inc., a Government contractor which eventually became bankrupt. The bank claimed Bond's inventory by virtue of its security agreement. The United States claims the inventory by virtue of the title vesting clause. The bank contended that such a claim would extinguish its interest in the collateral and was therefore compensable as a Fifth Amendment taking under the rule of *Armstrong v. U.S.,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

The court, in a long and complex analysis, concluded, as previously stated, that it would shift, particularly where priority in payment rather than possession of the collateral was involved, to characterizing the Government's claim thereto as a purchase money security interest rather than title. The court concluded that the claim of the United States, therefore, would be prior to that of the bank, which it termed a general lien creditor, to the extent of its uncredited progress payments, holding that since the Government's security interest in the inventory was not fully satisfied, there was no excess value to apply on the bank's lien.

We take notice of the turn in direction taken by the Court of Claims. However, the analysis of the court is not inconsistent with the principles of law stated herein. Its reasoning supports our holding particularly with respect to *Kimbell* and *Murdock, supra,* relied on by appellant.

### VII.

### VERCO PREFERENCE CLAIMS

Verco, in Count 10 of its complaint, alleges that a debtor-creditor relationship resulted from it having received previous advances from the Government. Accepting the Government's position of automatic transfer of title, Verco contends that when it purchased materials or paid labor to manufacture inventory, given the other elements of preference, transfer of title or ownership thereby improved the position of the Government. Verco alleges that during the 90-day preference period the level of the Government's inventory was increased by $95,500 and that it delivered within the period, goods in the value of some $544,000.

The Government contends that Verco is attempting to by-pass the title vesting clause and requiring the Government to pay twice for the inventory and delivered materials which it owned prior to such delivery. It points out that as to material or inventory Verco had on hand prior to the 90 days, delivery within that period should not constitute a preference since Verco had no interest in and contributed nothing to such material or inventory within that period. It argues that this would include inventory worth more than $540,000.

■ This issue must be considered in the context of a motion to dismiss. Essentially, Verco alleges that while the Government was a creditor and while Verco was insolvent, within 90 days prior to bankruptcy, the Government inventory level increased by $95,000 and that it received deliveries of product worth over $500,000, all as a result of the expenditure of Verco funds. As indicated in Section IV above, the standard in a motion to dismiss is that it must be found that there is an insuperable bar to relief. Under this test it appears that Verco has pleaded the various basic elements of preference under 11 U.S.C. § 547.

Assuming *arguendo* that the perspective of *Marine Midland* were applicable, the appellant's position would be stronger. The

Government would indisputably be a creditor. Accession of its lien to collateral provided by assets of the debtor within the 90-day period would be subject to the reach of § 547(c)(5). See 4 *Collier on Bankruptcy* (15th Ed.) ¶ 547.41.

Appellee's arguments and contentions, on the issue of preference basically do not meet the strict standard of a motion to dismiss.

The order dismissing the claims relating to preference is therefore REVERSED.