CUTLER-HAMMER, INC., Respondent, v. INDUSTRIAL COMMISSION and others, Appellants. [Two cases.]

*May 1—June 6, 1961.*

620

For the appellants Fischer and Przybylski there was a brief by *Robert E. Gratz,* attorney, and *Daniel L. Shneidman* of counsel, both of Milwaukee, and oral argument by *Mr. Gratz.*

For the appellant Industrial Commission the cause was submitted on the brief of *Arnold J. Spencer,* chief counsel of the unemployment compensation division, and *Ralph E. Kline* of Madison.

For the respondent there was a brief by *Michael, Spohn, Best & Friedrich,* attorneys, and *Thomas S. Stone, Joseph*

*R. Filachek,* and *James C. Mallatt* of counsel, all of Milwaukee, and oral argument by *Mr. Stone* and *Mr. Filachek.*

CURRIE, J. In the instant cases no question is raised by the employer or employees as to whether the vacation payments received by the employees were "wages" under sec. 108.05 (4) (b), Stats., which is the applicable statute. The employees concededly received sufficient vacation payments to exceed their applicable weekly benefit rates if the employer's allocation to the weeks immediately after their layoffs in March, 1958, was permitted by the collective-bargaining agreement. Therefore, the issue before us is whether such allocation of the vacation periods by the employer was permissible under the agreement.

In resolving this issue the crucial question is whether past established practice of the employer is to be taken into consideration in interpreting the vacation provisions of the collective-bargaining agreement. The appeal tribunal determined that the contract provisions were unambiguous and, therefore, such past practice was wholly immaterial. This is the position espoused by the commission and the employees on these appeals. On the other hand, the circuit court held that the contract provisions were ambiguous and evidence of past employer practice was material in construing such provisions. On the basis of the undisputed evidence as to such practice, that court determined that the employer had the right under the agreement to allocate the vacation period of the affected employees as it did.

Contractual relations have existed between the union and the employer since 1937. The particular collective-bargaining agreement in effect at the time of the March, 1958, layoffs bears date of March 1, 1956, and was made effective for a period of three years from that date. The provisions of such agreement which are applicable to vacations read as follows:

### Paragraph 1.

"The assignment of specific days on which each individual will take his vacation will be made by the management with due consideration to both the wishes of the individual and the continued efficient operation of each department concerned."

### Paragraph 2.

"Preference in the matter of dates and in the case of conflict will, of course, be given to those persons having the longest departmental seniority. Arrangements for individual vacations will be made between each individual and his foreman, and the management reserves the right to change vacation dates in those cases where the company's efficient operation is jeopardized."

### Paragraph 3.

"It will be necessary for each person to specify to his foreman by January 1st the period during which he would prefer his vacation."

### Paragraph 4.

"A vacation may be split by whole weeks. Vacations may be postponed or rescheduled for a later date only in case of sickness or other disability occurring prior to the scheduled date, and only in the event that such postponement does not handicap the efficient operation of the department. Vacations may not be postponed from one year to another and made accumulative, but will be forfeited unless completed during the calendar year. They cannot be applied in whole or in part to absence during any period other than that specifically allotted for vacation. No allowance will be made for sickness during a vacation period."

### Paragraph 5.

"A vacation period may not be waived and extra pay received for work during the period unless change is agreed to by the union involved and the management. Employees who are discharged shall not receive vacation pay."

(The paragraph numbers have been inserted for the convenience of the court in making reference to a particular paragraph.)

It will be noted that paragraph 2 reserves in the employer the right to change vacation dates where its "efficient operation is jeopardized" without limiting such efficient operation to the particular department in which the employee is employed. On the other hand, paragraphs 1 and 4 also refer to "efficient operation" but such efficient operation is limited to the particular department in which the employee is employed. Therefore, the question arises as to whether "efficient operation," as used in paragraph 2, means something different, or embraces some other phase of the employer's operations, than do the same two words as they appear in paragraphs 1 and 4. We deem that this question does present an ambiguity and that the circuit court was clearly right in so holding.

We consider that the problem, of whether evidence of past practice is material in construing a contract, is part and parcel of the more-embracing issue of whether parol testimony of surrounding circumstances is admissible for such purpose. In *Georgiades v. Glickman* (1956), 272 Wis. 257, 264, 75 N. W. (2d) 573, we approved the test of ambiguity suggested by Williston. Under such test, the court looks at the contract in the light of the offered evidence in order to determine whether such evidence "would not persuade any reasonable man that the writing meant anything other than the normal meaning of its words would indicate." 3 Williston, Contracts (rev. ed.), p. 1807, sec. 629. Even if we were to adopt the view that, without consideration of the evidence in the record of established past practice of the employer, we would interpret the contract words of paragraph 2 "where the company's efficient operation is jeopardized" as restricted

to a situation which threatened the employer's production, this is not the case when such evidence of past practice is considered.

The evidence of past practice goes back at least to the year 1948, but the collective-bargaining agreement before us only covers the period subsequent to March 1, 1956. The employer offered in evidence five prior contracts between the union and it, but the appeal tribunal refused to admit them in evidence on the ground that the existing agreement of March 1, 1956, was unambiguous. The admissibility of such offered exhibits was argued at some length before the appeal tribunal and during the course thereof counsel for the employer stated, "the provisions [of the offered contracts] which are particularly in point here have been virtually unchanged throughout this entire period of time." This was sufficient to apprise both the appeal tribunal and this court of the nature of the offered exhibits and the purpose for which offered. Such statement of counsel was equivalent to and served the purpose of an offer of proof. *Trzebietowski v. Jereski* (1914), 159 Wis. 190, 192, 149 N. W. 743; Boardman, Offer, Objection, and Preservation and Effect of Error, 1945 Wisconsin Law Review, 222, 228.

For the purpose of deciding the issue of the construction of the collective-bargaining agreement of March 1, 1956, with respect to the employer's reserved right to change vacation periods, we will assume, without deciding, that the prior offered contracts in effect between from 1948 to March 1, 1956, have virtually the same vacation provisions as does such March 1, 1956, agreement. In this connection it should be noted that the statement of counsel for the employer, that the vacation provisions of the offered five contracts are virtually the same as those of the March 1, 1956, contract, was not disputed before the appeal tribunal nor here.

The absence of such offered contracts in the record, however, does present a problem which will be dealt with later herein.

While the appeal tribunal refused to admit in evidence the five prior collective-bargaining agreements, it did not restrict the employer and the employees in presenting evidence on the issue of past vacation practice. Rather extensive testimony was given on such issue. The witnesses who testified in behalf of the employer with respect to such practice were Mathiesen, Reak, and Ulbricht. The witnesses who testified in behalf of the employees were Lorenz, Bailey, and Schroedter.

Mathiesen for fifteen years prior to 1950 had been superintendent of the major division of the employer and since then he has been the assistant works manager. Reak has been employed by the employer since 1941, and is presently manager of the data-processing department which includes the payroll department. Ulbricht also has been employed by the employer since 1941 and is manager of shop employment. Lorenz has been employed by the employer since 1941 and at the time of the layoff was serving his first year as president of the union. Bailey has not been employed by the employer but since 1939 has been business representative of District 10 of the International Association of Machinists. As such business representative, he has sat in on collective-bargaining sessions between the union and the employer, and has also attended shop-committee meetings held to pass on grievances which have reached the third step of the grievance procedure. Schroedter has been employed by the employer since 1933, and from 1937 to 1945, and again in 1946 to 1953, was president of the union.

We will now set forth a resumé of the testimony of the witnesses for the employer covering the past vacation practices of the employer.

In the latter part of January, or early part of February, of each year, each foreman passes out cards to the employees in his department on which the employees are asked to indicate the vacation period or periods desired by them for the current year. Previously each foreman has determined the vacation pattern for the year in his department on the basis of how many employees can be spared at any particular time. After the cards are returned, if more requests for vacations covering a particular week have been made by the employees than can be spared from the department, the allocations are made on the basis of seniority. Conferences are held with employees, whose requests cannot be honored, to work out a substitute period. Cards are then issued to each employee designating his or her assigned vacation period or periods. This practice results in some assignments of vacation that do not coincide with the employee's wishes.

The records of these preliminary vacation assignments are kept at the foreman level and not transmitted to the payroll department. The payroll department, however, does have a record showing the amount of vacation each employee is entitled to and the pay due for the same. Approximately three weeks before an employee is to go on a vacation, the foreman notifies the payroll department that such employee will be going on vacation and specifies the time the vacation begins and the length thereof. This enables the payroll department to have the check made out for the vacation pay which is given to the employee at the start of the vacation. Sometimes, a foreman permits an employee to shift his vacation from that designated because of some emergency and in such a situation the foreman is unable to give the payroll department such three weeks' advance notice.

However, if some unusual contingency occurs such as a layoff, or some other termination of work other than a discharge for cause, it has been the invariable practice of the employer since at least 1948 to reallocate the vacation period

of the affected employee so as to allocate his vacation to the first week, or weeks, following such termination of work. When such a situation arises, Ulbricht or one of his assistants holds a personal interview with the employee in which the employee is advised of such reallocation of vacation. The payroll department is also immediately notified by the foreman so that the vacation pay can be paid as soon after termination as such vacation pay can be computed. Since 1948 two major layoffs for extended times have occurred in the operation of the employer. One of these was in 1949 and the other in 1954.

Reak testified that it would disrupt the efficient operation of the payroll department if the employer were to discontinue the past practice of reallocating vacations of employees whose work is being terminated for layoff or other cause. He explained that if such practice were not followed, the payroll department would have to set up a special system of accounting to keep track of each employee's previously assigned vacation period so as to be able to issue his payroll check at the future time to which such vacation had been originally assigned whether the employee was then at work or not. Past experience has shown that employees whose work has been terminated for layoff or other reasons sometimes leave Milwaukee and go to distant states and the employer then would be faced with the problem of locating such employees in order to pay them their vacation pay. The employer has had difficulty in the past in attempting to locate terminated employees who have pay checks coming.

The witnesses Lorenz, Bailey, and Schroedter did not directly dispute any of the foregoing testimony given by the employer's three witnesses. However, there was a dispute in testimony between the employer's witnesses and Lorenz and Bailey as to what transpired at the collective-bargaining sessions in 1954 when a new contract between the employer and the union was being negotiated.

Mathiesen's testimony as to such disputed point in such 1954 negotiations was as follows: The union brought up the matter of the employer's past practice of allocating vacations to the first week or weeks following the period of layoff, and stated that this penalized the employees with respect to unemployment compensation benefits. The union requested the employer to agree to a provision in the contract which would require the employer to discontinue such practice. The employer stated that its representatives would look into the matter and give the union a reply. The employer did look into the matter and became apprised for the first time that such practice did affect unemployment compensation. However, the employer informed the union that the employer refused to agree to the requested change in the contract.

Lorenz testified that the matter of the employer's practice of reassigning vacations to the layoff period was discussed at a 1954 bargaining session but he denied that the union then requested a change in the contract to cover the situation. Bailey, on the other hand, testified that he was not aware of the employer's past practice and that such practice was not discussed in the 1954 bargaining session. His recollection of what then occurred was that he had merely mentioned in the bargaining negotiations that there had been a change in the Wisconsin Unemployment Compensation Law regarding vacation pay and layoffs and that the discussion went no further.

In view of the dispute in the testimony as to what took place in the 1954 bargaining session, we make no attempt to resolve the same. This is because fact finding in unemployment compensation cases is the function of the Industrial Commission and not the reviewing court. For the purposes of this appeal we must assume that no request was made to the employer for a change in the contract provision relating

to vacations so as to preclude the right of the employer to assign vacations to layoff periods.

In 1954 a major layoff occurred at the plant of the employer. Subsequent to the bargaining negotiations of that year, at a meeting of the shop committee composed of both representatives of the union and the employer, the union did bring up the matter of employer's vacation practice of allocating vacations to the first week or weeks of the layoff. The union representatives referred to the situation of employees who had originally been assigned vacation periods subsequent to the layoff who would have made special plans for such later period. The employer offered, as a solution to the problem, to permit such employees to have a leave of absence during the desired period, such leave of absence to be without pay, and the union agreed thereto. The testimony with respect to this occurrence stands undisputed in the record and we deem this incident of practical construction of the collective-bargaining agreement to be significant.

Another undisputed fact which we consider to be material is that the union never filed any grievance with respect to the employer's reallocating of vacations to the layoff periods of the 1949 and 1954 general layoffs.

There remains to be considered the testimony of the witness Schroedter. He testified that sometime prior to 1942, when he was president of the union, it was understood at a meeting of the shop committee that, in the event of a layoff and a calling back of an employee before the end of the year, such employee's vacation would be rescheduled thereafter. He further testified it was then agreed that, if such employee never returned to work, he would later receive his vacation pay. Schroedter further stated that he was never advised thereafter of any employer practice with respect to vacations. On the other hand, Mathiesen testified that he had started attending shop-committee meetings in 1942 as an employer representative and attended them regularly ever

since, and had never been informed of the "understanding" so testified to by Schroedter. Accepting Schroedter's testimony as true, we fail to see any materiality to the same. If there was such an understanding between the employer and employee with respect to handling vacations made before 1942, it had ceased prior to 1948. This is because of the undisputed testimony that since 1948 the employer has followed the uniform practice with respect to work terminations, such as layoffs previously described herein.

Because the evidence relating to the past vacation practice of the employer is undisputed and but one inference can be reasonably drawn therefrom, a question of law is presented and no finding by the commission with respect thereto is necessary. *Mrs. Drenk's Foods v. Industrial Comm.* (1959), 8 Wis. (2d) 192, 197, 99 N. W. (2d) 172, and *Van Roy v. Industrial Comm.* (1958), 5 Wis. (2d) 416, 425, 92 N. W. (2d) 818. When the language of a contract is not clear and unambiguous the practical construction given to it by the acts of the parties is of "great force" or "entitled to great weight." *Joseph Mann Library Asso. v. Two Rivers* (1956), 272 Wis. 441, 446, 76 N. W. (2d) 388, and *Georgiades v. Glickman, supra,* at page 266. Under such circumstances the court ordinarily will place the interpretation upon the terms of the contract which the parties in the course of their dealings have adopted. *George J. Meyer Mfg. Co. v. Howard Brass & Copper Co.* (1945), 246 Wis. 558, 574, 18 N. W. (2d) 468.

In the recent unemployment compensation case of *Darling v. Industrial Comm.* (1958), 4 Wis. (2d) 345, 361, 90 N. W. (2d) 597, this court stressed the vacation practice of the employer company in interpreting the vacation clause of the collective-bargaining contract and adopted an interpretation adverse to the employer because of such practice. The same principle is applicable to the instant situation except

that here such past practice requires an interpretation which is adverse to the employees.

We start with the premise that, unless a collective-bargaining agreement contains limitations upon the employer's discretionary right at common law in setting times for vacations, the employer has absolute discretion in establishing the time for vacation even though the amount of pay and length of vacation be prescribed by such agreement. *Darling v. Industrial Comm., supra,* at page 360. The instant issue of contract interpretation, therefore, is not whether the collective-bargaining agreement granted to the employer the right to reallocate vacations to the layoff period, but rather how much of such common-law right to designate the vacation periods of employees the employer has yielded up under the vacation provisions of the agreement.

It is clear from the collective-bargaining agreement vacation provisions, and the practical interpretation thereof by the parties, that the expressed preferences of employees with respect to vacations were taken into consideration by the foreman in assigning the originally allocated vacation periods of employees. However, the employer under the agreement had reserved the right to change such originally assigned vacation periods. Such reserved right was not absolute but was restricted to situations where the employer's "efficient operation is jeopardized."

One of the definitions of "jeopardize" appearing in Webster's New International Dictionary (2d ed.), is "To expose to loss or injury." It is undisputed that, if the employer did not reallocate vacations to the first week, or weeks, of layoff, the efficient operation of its payroll department would be injured. The employer over at least a ten-year period prior to the 1958 layoff had construed such factor as sufficient justification to change vacation periods and to reallocate vacations to the first week, or weeks, of layoff. Until the

1958 layoff, the union's conduct constituted an acquiescence in such interpretation.

Neither the commission nor this court should substitute its own construction of the contract provisions for that which the parties through practical interpretation have placed thereon. Practical construction by the parties of labor agreements should, if anything, be accorded wider scope than the interpretation of ordinary commercial contracts. Courts and arbitrators in construing labor contracts have generally rejected a narrow and technical approach, such as herein adopted by the appeal tribunal and the commission.

In *Kennedy v. Westinghouse Electric Corp.* (1954), 16 N. J. 280, 287, 108 Atl. (2d) 409, 412, the New Jersey court speaking through Mr. Justice BRENNAN, now of the United States supreme court, declared:

"It is obvious that the important function of the collective-bargaining agreement to further industrial tranquility justifies, indeed demands, that the agreement 'be construed not narrowly and technically but broadly and so as to accomplish its evident aims,' *Yazoo & M. V. R. Co. v. Webb* [64 Fed. (2d) 902], *supra*, 31 Am. Jur., Labor, sec. 113; and that has been the decided tendency of the cases."

1 . Teller, Labor Disputes and Collective Bargaining, p. 505, sec. 169, states that the tendency of the cases is definitely in the direction of a broad and liberal construction of collective-bargaining contracts, and that methods employed by the parties in connection with prior and similar agreements will be accorded great weight.

For the reasons hereinbefore set forth we conclude that the act of the employer, in reallocating the vacations of the employees Fischer and Przybylski to the first two weeks of the layoff periods following their layoff, did not violate the collective-bargaining agreement, assuming that the prior collective-bargaining agreements offered in evidence contain

substantially the same vacation provisions as does the instant agreement.

In support of its conclusion, that the collective-bargaining agreement prohibited the employer from changing the originally designated vacation periods of the two employees, the appeal tribunal cited the following sentence appearing in paragraph 4 of the vacation provisions thereof:

"They [vacations] cannot be applied in whole or in part to absence during any period other than that specifically allotted for vacation."

As pointed out by the learned trial judge in his memorandum opinion, the error in citing this quoted sentence for such purpose is that all of paragraph 4 is devoted to stating restrictions with respect to the vacation rights of the employees, not the employer. The objective of the quoted sentence obviously is to prohibit an employee from voluntarily absenting himself from work, at a time other than his assigned vacation period, and then having such absence count as vacation time. If employees were not so prohibited, they could take their vacations at any time which suited their whim or convenience irrespective of the wishes or requirements of the employer.

We turn now to the question of how the error of the appeal tribunal, in refusing to admit the five prior collective-bargaining agreements in evidence, affects the disposition of these two appeals.

The brief of the respondent employer purports to print the vacation provisions of such five prior agreements as a supplemental appendix. We deem this to be improper because such quoted contract provisions do not constitute part of the record. Therefore, we are not privileged to consider the same. We have concluded that it is necessary to remand the proceedings to the commission for the purpose of admitting such five agreements in evidence, and of making a

finding as to whether or not the vacation provisions thereof are substantially the same as those of the agreement of March 1, 1956. If the resulting finding is in the affirmative, then the orders to be entered will be that the employee Fischer was not unemployed in weeks 12 and 13, and the employee Przybylski was not unemployed in weeks 13 and 14, within the meaning of the Wisconsin Unemployment Compensation Act. Such orders should also provide that such employees were unemployed during the subsequently occurring weeks which correspond to their originally designated vacation periods. On the other hand, if the commission should find that the vacation provisions of the five prior agreements are not substantially similar to those of the March 1, 1956, agreement, our within opinion will not be controlling on whether the past vacation practices of the employer control the interpretation of the vacation provisions of such March 1, 1956, agreement.

We recommend that, in the future, appeal tribunals and commission examiners adopt the practice of permitting documentary evidence, which has been offered and rejected at hearings, to be marked and made a part of the record for purposes of review by the commission and the courts, at least if counsel who have offered the same shall make such request. Such practice would obviate the cumbersome procedure here made necessary.

*By the Court.*—Those portions of the judgments which set aside the orders of the commission are affirmed; those portions of such judgments which adjudicated the rights of the employees to unemployment compensation benefits are reversed with directions to remand to the Industrial Commission for further proceedings in accordance with this opinion.