COMPTON, Plaintiff-Respondent, v. SHOPKO STORES, INC.,
Defendant-Appellant.

Supreme Court

*No. 77–441. Argued December 4, 1979.—Decided February 7, 1980.*
(Also reported in 287 N.W.2d 720.)

For the appellant there were briefs by *Frederick C. Wieting* and *Evrard, Duffy, Holman, Faulds & Peterson* and oral argument by *Joseph P. Holman,* all of Green Bay.

For the respondent there was a brief by *Vivi L. Dilweg, Donald J. Wall* and *Liebmann, Conway, Olejniczak, Jerry & Dilweg, S.C.,* and oral argument by *Gregory B. Conway,* all of Green Bay.

CONNOR T. HANSEN, J. Compton was employed by Shopko in various executive capacities from April, 1968, until the date of his discharge. Shopko had unilaterally established an Executive Bonus Plan. Under the terms of the plan, those executives employed by the company at the close of its fiscal year received bonus payments in accordance with the provisions of the plan. The fiscal year for Shopko ended on the last Sunday in February.

Compton had participated in the bonus plan for the fiscal years 1969–1970 to 1973–1974, both inclusive. He was discharged for good cause on December 27, 1974. The 1974–1975 fiscal year of Shopko ended on February 22, 1975. Shopko decided that Compton was not an employee of the company at the close of the 1974–1975 fiscal year and hence he did not receive an executive bonus payment for that fiscal year.

Trial of the case was to the court and the trial court found that Compton was an employee of Shopko on February 22, 1975, and therefore was entitled to the benefits of the bonus plan for the fiscal year 1974–1975.

The issues on appeal are: (1) Whether Compton had been effectively discharged on December 27, 1974, or remained an employee of the company until February 22, 1975; and (2) if he was not employed on February 22, 1975, was he nevertheless entitled to participate in the Executive Bonus Plan for the 1974–1975 fiscal year.

The general rule is that findings of fact by the trial court will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence. *Preston v. Schaefer,* 89 Wis.2d 1, 7, 8, 277 N.W.2d 794 (1979); *Beasley v. Konczal,* 87 Wis.2d 233, 239, 275 N.W.2d 634 (1979). However, in the case at bar the essential facts are undisputed, and this court has repeatedly held that on review this court is not bound by a finding of the trial court which is based upon undisputed evidence when that finding is essentially a conclusion of law. *Teledyne Industries, Inc. v. Milwaukee,* 65 Wis.2d 557, 566, 223 N.W.2d 586 (1974); *Browndale International v. Board of Adjustment,* 60 Wis.2d 182, 199, 208 N.W.2d 121 (1973), cert. denied, 416 U.S. 936 (1974); *WXIX, Inc. v. Scott Heating & Air Conditioning Co.,* 38 Wis.2d 278, 281, 156 N.W.2d 451 (1968); *Boutelle v. Chrislaw,* 34 Wis.2d 665, 673, 150 N.W.2d 486 (1967). It is our opinion that in this case the finding of the trial court is based upon undisputed evidence and therefore such finding is essentially a conclusion of law.

We first review the provisions of the Executive Bonus Plan as they applied to all employees in the applicable executive classification. Secondly, we consider the provisions of the plan as they applied to the particular case of Compton.

At the time Compton was employed by Shopko in April, 1968, the Executive Bonus Plan constituted a verbal commitment by the company. It entitled certain qualified executives, of which Compton was one, to share in the profits of the company if they were employed by the

company at the end of the fiscal year. The bonus share was based on a percentage of salary, from zero to fifty percent, depending on the outcome of the year's performance of the company. It was entirely funded from company profits.

The general provisions of the bonus plan remained essentially the same from the date of Compton's employment in 1968 until his discharge in December, 1974. However, as the company grew and the number of employees eligible to participate in the plan increased, the provisions of the plan were gradually reduced to writing. An Executive Group Manual, dated September 1, 1973, was prepared and distributed to all of the personnel in the executive group, including Compton. The manual included written rules and regulations as to qualifications for receiving the bonus. The manual stated, "The Executive Bonus Plan is probably the most meaningful and should represent an important part of the total annual compensation paid." It also set forth the pay range for the executive group as follows: "The pay ranges for each position in the Executive Group reflect total compensation to include salary, bonus and automobiles." From time to time changes were made in the Executive Group Manual, but these changes only pertained to the methods of arriving at the amounts to which persons in the executive bonus group would be entitled. These changes were distributed to the executives. The verbal rule of the company that required an executive in the Executive Bonus Plan to be employed at the end of the fiscal year in order to be eligible for the bonus for that year was not contained in the Executive Group Manual. In June, 1974, the rule was confirmed in writing and under date of June 19, 1974, was distributed to all employees, including Compton. The written rule specifically stated, "Bonus payments shall not be made to any person not employed at the end of the fiscal year." The written rule thus reduced to writing the policy or rule of the

company which had been effective since before Compton became an employee of the company.

We now set forth the facts relating to the individual situation of Compton. He had participated in the Executive Bonus Plan continually from the close of the 1969–1970 fiscal year. He knew that an executive had to be employed with the company at the end of the fiscal year in order to be eligible for the bonus for that year.

During the years with the company, Compton's executive responsibilities and salary had increased. He had become director of the catalog showrooms, and his responsibilities included preparing a budget and seeing to it that the department operations fell within the budget. In September, 1974, he was told that the catalog showroom was not operating within the budget. He was informed by the president of Shopko that his performance was substandard and that sales were below budget.

On December 27, 1974, Compton was called into the office of the president. The president informed him that the figures showed a $313,000 loss in the tenth fiscal period, and showed a continuous financial substandard performance. Compton was informed that he was dismissed as of that date, and his personnel action from stated as the reason for dismissal, "one position higher than his capabilities" and "[l]acked leadership qualities."

At the time of his termination on December 27, 1974, Compton was given severance pay in the amount of $4,178.64, which amounted to about eight weeks' pay. This amount was determined on the basis of his longevity with the company, although at the time Shopko had no written policy in regard to severance pay. He was also given a check in the amount of $1,044.66, representing two weeks' vacation pay. The severance pay check stated it was severance pay; however, the legend on the check stub stated, "8 weeks severance pay for period 12/29/74 thru 2/22/75." The check stub on the vacation pay check stated "2 weeks vacation pay for w/e 3/1/75 and w/e

3/8/75." Medical insurance was deducted through January 1, 1975. A wage and income tax statement issued by Shopko for Compton reflected 1975 wages, tips and other compensation in the amount of $5,223.30, which is the sum of the severance pay and vacation pay checks given to Compton. The checks for the severance pay and vacation pay were given to Compton on December 27, 1974, and cashed by him on December 30, 1974.

After his employment at Shopko was terminated on December 27, 1974, Compton could no longer perform any duties for Shopko. He testified that he was free to seek other employment the following day and did, in fact, secure employment with another company within two or three weeks after he was discharged by Shopko.

The fiscal year 1974–1975 ended on February 22, 1975. Participants in the Executive Bonus Plan were paid a bonus for the fiscal year 1974–1975 equal to 25 percent of their salary. Compton did not receive a bonus for the fiscal year 1974–1975. The trial court found that Compton was an employee of Shopko on February 22, 1975, and therefore was entitled to an executive bonus payment for the fiscal year 1974–1975.

## I.

In the instant case, the undisputed facts show that Compton was discharged by Shopko on December 27, 1974, for good cause, and did not perform any services for Shopko after that date. At the time of his termination, he was given severance pay which amounted to approximately eight weeks' pay, plus two weeks' vacation pay. Federal, state and social security taxes were deducted from this severance pay and were reported on the 1975 W–2 forms issued to Compton by Shopko. The trial court concluded that all incidents of employment were attached to the severance pay, and the severance pay extended his employment with Shopko to February 22, 1975. This is a conclusion of law, and therefore this

court is not limited in its review by the finding of the trial court.

Shopko argues that the trial court erred as a matter of law because Compton was discharged for good cause on December 27, 1974, and did not and could not perform any services for Shopko after that date; therefore has employment did not extend beyond December 27, 1974.

Certain Wisconsin statutes which are concerned with the employment relationship indicate that employment means the performance of services. Sec. 108.02(5)(a), Stats., states that, for purposes of unemployment compensation, employment "means any service, including service in interstate commerce, performed by an individual for pay." The Workers' Compensation Act states that an employee is every person rendering services to another. Sec. 102.07(4) and (8). And sec. 101.01(2)(b) provides that the term "employment" includes any trade, occupation or process of manufacture or any method of carrying on such trade, occupation or process of manufacture in which any person may be engaged.

In *Slocum Straw Works v. Industrial Comm.*, 232 Wis. 71, 78, 79, 286 N.W. 593 (1939), this court discussed in general the meaning of the word "employment":

"Webster defines the word 'employment' as:

" 'That which engages or occupies; that which consumes time or attention; occupation; office or post of business; service, as agricultural employments; public employment.'

"And defines the word 'employed' as:

" 'To occupy; busy; devote; concern; as, to employ time in study; to employ one's energies to advantage. To make use of the services of; to have or keep at work; to give employment to; to intrust with some duty; or behest; as, to employ a hundred workmen; to employ an envoy. . . .'

"20 C.J. p. 1245, defines 'employment' as follows:

" 'The word is a common one, generally used in relation to the most common pursuits, and therefore ought to be received as understood in common parlance. Although it has been said that the term implies a contract on the part of the employer to hire, and on the part of the employee to perform services, and that until such a contract is mutually entered into, it can have no binding obligation on either party, nevertheless it does not necessarily import an engagement or rendering of service for another, but may refer either to such service, or to a vocation, business, or profession followed or practiced independently. The word is not of the technical language of the law, or of any science or pursuit, and must be construed according to the context and the approved usage of the language. It has been variously defined as the act of attending to the duties and services of another; the act of being employed for one's self, in attending to one's own affairs; the act of hiring; the act of employing or using; agency or service for another or for the public; an agency for a temporary purpose, which ceases when that purpose is accomplished; the state of being employed; appointment; avocation; business; calling; commission; engagement; occupation; office; profession; service; trade; use; vocation; work; also the object of industry; that which engages the head or hands.' "

Employment means the performance of services or occupation. Since Compton performed no services, and could perform no services, for Shopko after his discharge on December 27, 1974, he cannot be considered as having been employed after that date.

Counsel for Compton directs our attention to the Unemployment Compensation Act and argues that under the provisions of sec. 108.02 (6) and (17), Stats., Compton would not be eligible for unemployment benefits during the eight weeks following his discharge. While this may be true, this case is not concerned with whether Compton was unemployed so as to be eligible for unemployment compensation benefits. The issue is whether he

was employed by Shopko during this period so as to make him eligible for an executive bonus payment under company rules and policies. Counsel seems to argue that because Compton is not eligible for unemployment compensation benefits, he must be an employee of Shopko. In any event, the Unemployment Compensation Act, in contrast to its definition of "unemployment," also defines "employment" as "service . . . performed by an individual for pay." Sec. 108.02(5)(a), Stats. The purpose of the Unemployment Compensation Act is to "cushion the cruel blow of unemployment," *Salerno v. John Oster Mfg. Co.*, 37 Wis.2d 433, 441, 155 N.W.2d 66 (1967); to minimize the loss of income from unemployment, *Kessler v. Industrial Comm.*, 27 Wis.2d 398, 401, 134 N.W.2d 412 (1965); and to mitigate economic loss to a worker, *Milwaukee Transformer Co. v. Industrial Comm.*, 22 Wis.2d 502, 511, 126 N.W.2d 6 (1964). If a person is receiving income in the form of severance pay, he has no need for unemployment compensation; the purposes for which unemployment compensation was established are being accomplished by severance pay.

Severance pay, by definition, means compensation given to an employee upon the severance of his employment relationship with his employer. Contrary to the trial court's conclusion, severance pay does not extend the employment period, but terminates it.

The general effect of severance pay is discussed in *Annotation, Construction and effect of severance or dismissal pay provisions of employment contract or collective labor agreement*, 40 A.L.R.2d 1044, 1045 (1955):

" 'Dismissal compensation may be defined as the payment of a specific sum, in addition to any back wages or salary, made by an employer to an employee for permanently terminating the employment relationship primarily for reasons beyond the control of the employee.' Such compensation, more recently often referred to as

'severance pay,' is usually associated with a termination of the employment relationship for reasons primarily beyond the control of the employee; its purpose is to assure a worker whose employment is terminated funds to depend upon while he seeks another job. . . ." (Footnotes omitted.)

The term "severance pay" is defined in *Republic Steel Corp. v. Maddox*, 275 Ala. 685, 689, 158 So.2d 492, 494 (1963), reversed on other grounds, 379 U. S. 650 (1965), as follows:

"Severance pay, by its very definition, means compensation due an employee, upon the severance of his employment status with the employer. He must accept his discharge as final before any claim for severance pay can be made. A payment of severance pay by the employer and the acceptance of the same by the employee would, in our opinion, be the complete manifestation of the termination of the employment relationship. A claim for severance pay could never arise during the employment relationship of the parties. . ."

It has also been stated that severance pay is a form of compensation for the termination of the employment relation primarily to alleviate the consequent need for economic readjustment. *Mace v. Conde Nast Publications, Inc.*, 155 Conn. 680, 683, 237 A.2d 360, 361 (1967); *Adams v. Jersey Central Power & Light Co.*, 21 N.J. 8, 13, 14, 120 A.2d 737, 740 (1956). Severance pay is accumulated compensation for past services. *Botany Mills, Inc. v. Textile Workers Union*, 50 N.J. Super. 18, 30, 141 A.2d 107, 113 (1958); *Mace v. Conde Nast Publications, Inc., supra*, at 683, 237 A.2d at 361; *Owens v. Press Publishing Co.*, 20 N.J. 537, 546, 120 A.2d 442, 446 (1956).

Compton places considerable reliance on *Kruzer v. Giant Tiger Stores, Inc.*, 39 Ohio Misc. 129, 317 N.E.2d 70 (1974). This is a county court case and concerns an

employee's rights under pension and profit sharing plans. We do not consider it persuasive authority for the proposition that severance pay paid to a discharged employee on the date of discharge extends employment beyond the date of discharge.

Compton's employment with Shopko terminated with his discharge on December 27, 1974. It is not argued that this discharge was not for good cause. He performed no services for Shopko after that date, was free to seek other employment the following day, and in fact began working for another company two or three weeks after his termination. The fact that he received severance pay did not extend his employment and he was not employed by Shopko as of February 22, 1975.

## II.

The facts indicate that Compton was employed by Shopko under a verbal contract of employment from the inception of his employment in 1968 to the time of his termination in December of 1974. In his second year of employment, he participated in the Executive Bonus Plan which enabled certain qualified executives to share in profits, based on a percentage of their salary, which percentage fluctuated with the performance of the company. He continued to participate in this plan through the 1973–1974 fiscal year. It was a company rule that an executive in the Executive Bonus Plan had to be employed with the company at the end of the fiscal year in order to be eligible for the bonus for that year.

Compton knew and understood the details of the plan from the time of his eligibility for the bonus in 1969. Among other things, this is evidenced by a letter he wrote to Stephen Weller in April, 1973, more than 20 months before Compton was discharged. This letter details an offer of employment and includes an explanation of com-

pany benefits, one of which was the Executive Bonus Plan. In the letter Compton specifically advises Weller that "The employee must be employed by Shopko at the time bonuses are paid to be eligible for any share." The record also reflects that the rule was well known, not only to Compton, but to other executives within the class.

This court has characterized pension and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services, a binding contract is formed under which the employer is obligated to deliver the benefits under the terms of the plan. *Schlosser v. Allis-Chalmers Corp.*, 86 Wis.2d 226, 234, 271 N.W.2d 879 (1978) ; *Rosploch v. Alumatic Corp. of America*, 77 Wis.2d 76, 81–84, 251 N.W.2d 838 (1977) ; *Voigt v. South Side Laundry & Dry Cleaners, Inc.*, 24 Wis.2d 114, 116, 128 N.W.2d 411 (1964) ; *Zwolanek v. Baker Mfg. Co.*, 150 Wis. 517, 137 N.W. 769 (1912).

Shopko's Executive Bonus Plan constituted an offer of the benefits stated in exchange for service as an employee. It is clear that Compton and other Shopko employees worked with general knowledge of the offer. They knew that the company required them to be employed at the end of the fiscal year in order to be eligible for the bonus. Compton's performance of services for Shopko through fiscal year 1973–1974 constituted his acceptance of the offer, and a binding unilateral contract was formed. Notice of acceptance of the offer is not necessary; performance constitutes acceptance, *Zwolanek v. Baker Mfg. Co., supra,* at 523; and intent to accept is inferred from performance of the act. *Schlosser v. Allis-Chalmers Corp., supra,* at 237.

The bonus plan in this case constituted an offer of a a bonus in exchange for the services of an employee to be performed until the end of the fiscal year. The for-

mation of a binding contract under which the employer would be obligated to deliver the benefits under the terms of the plan occurs only upon the employee's completion of the required service. *Schlosser v. Allis-Chalmers Corp., supra,* at 234; *Voigt v. South Side Laundry & Dry Cleaners, Inc., supra,* at 116. Since Compton did not perform services and was not employed until the end of the fiscal year, February 22, 1975, Shopko was not obligated to pay him a bonus for the 1974–1975 fiscal year.

An analogous case is *Briggs v. Electric Auto-Lite Co.,* 37 Wis.2d 275, 155 N.W.2d 32 (1967), which involved an action to recover vacation pay under a collective bargaining agreement which provided that any employee who was in the active employ of the company on December 31st was entitled to vacation pay. The issue was whether the plaintiff-employees were entitled to vacation pay on a pro rata basis although they were not employees of the defer 'int on December 31, 1959, because their non-employm  status was caused by a unilateral act of the company and not through any fault of their own. The court stated that the entitlement of the plaintiffs to vacation pay depended upon the particular terms of their contract. The court also stated, *quoting Valeo v. J. I. Case Co.,* 18 Wis.2d 578, 585, 119 N.W.2d 384 (1963),

". . . 'If vacation rights be thought of as accruing or vesting in employees as they perform services, such accrual is qualified . . .' by various conditions in the contract like employee status on the eligibility date and these conditions must also be met." *Briggs v. Electric Auto-Lite Co., supra,* at 279.

The court held:

"Since the plaintiffs' rights depend upon the contract, we must examine its terms, not to make it speak where it is silent or contrary to what it says, but to discover what it does say. The contract provides for vacation pay based on a percentage of straight time earnings for a twelve months' period through December 31st with the

percentage varying directly with seniority. Any employee who is in active employment of the company on December 31st is entitled to vacation pay as so calculated. . . The first sentence of the paragraph sets forth the basis for vacation pay for eligible employees in the following terms, 'Vacation pay of eligible employees shall be based on. . . .' The second sentence defines who are eligible employees as follows: 'Any employee who is in active employ . . . on December 31 . . . .' We think the meaning of this contract is plain, that employees do not become entitled to vacation pay unless they are employees on December 31st." *Id.* at 280.

Compton relies on several cases which held that where there is a contract for the payment of a bonus, the employee's right to the bonus may not be defeated by his discharge when that discharge is without good cause, and argues that he is entitled to a proportionate share of the bonus. His reliance on those cases is misplaced. The trial court in the instant case found that the discharge of Compton was for good cause attributable to the employer. This finding is not challenged on appeal, and thus, the cases cited are not applicable. It has been held that where an employee was discharged for good cause prior to distribution of the proceeds of a general bonus plan, the discharged employee was not entitled to participate in the bonus plan. *Molburg v. Hunter Hosiery, Inc.,* 102 N.H. 422, 158 A.2d 288 (1960) ; *Croskey v. Kroger Co.,* 259 S.W.2d 408 (Mo. App. 1953) ; *Watwood v. Potomac Chemical Co.,* 57 N.J.E. 631, 42 A.2d 728 (1945). *See: Annotation, Rights and liabilities as between employer and employee with respect to general bonus or profit-sharing plan,* 81 A.L.R.2d 1066 (1962).

The contract in this case required Compton to be employed at the end of the fiscal year, February 22, 1975. Since he was not employed by Shopko at that time, he was not entitled to receive a bonus for the 1974–75 fiscal year.

*By the Court.*—Judgment reversed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. The majority concedes that this case turns on the resolution of a question of fact, namely when did the employment terminate, on December 27, 1974, when the employee's services ended or on February 22, 1975, the last day for which severance pay was paid. Resolution of this factual issue depends on determining the effect of the employer's awarding the employee severance pay. There was no contract policy or guideline concerning severance pay.[1] Thus whether severance pay extended the period of employment depended on the intent of the employer in awarding severance pay.[2]

The majority opinion concedes that the trial court made findings of fact that the employee's employment was extended to February 22, 1975 by the granting of severance pay.[3] The majority does not conclude that

[1] The trial court found:

"13. That as of the date of his termination of December 27, 1974, there was no written policy or any guidelines adopted by Shopko with respect to severance pay or vacation pay;"

[2] A person's intent in doing an act is a question of fact. *Voc. Tech. & Adult Ed. Dist. 13 v. ILHR Dept.*, 76 Wis.2d 230, 246, 251 N.W.2d 41 (1977); *Liebmann Packing Co. v. Industrial Comm.*, 27 Wis.2d 335, 339, 134 N.W.2d 458 (1965); *Cheese v. Industrial Comm.*, 21 Wis.2d 8, 15, 123 N.W.2d 553 (1963).

[3] The trial court made the following findings of fact, *inter alia:*

"27. . . . The court feels at this time that the better conclusion to be drawn from the evidence is that by electing to grant Mr. Compton's severance pay to include February 22, 1975, by its deliberate choice, Shopko, Inc., decided to continue Mr. Compton on the payroll and employed on that date;

"28. That notwithstanding the fact that he was to be entitled to vacation pay over and above that, that is, the availability of vacation pay, in the judgment of this court would not and could not in any event extend the period of his employment;

"29. Whether by design or otherwise, Shopko, Inc., determined that he was being paid severance pay to February 22, 1975, which, incidentally, seems to coincide with the end of the fiscal year of Shopko, Inc.;

the finding is either unreasonable or is against the great weight and clear preponderance of the evidence. Nevertheless the majority overturns the trial court's findings of fact by labeling them conclusions of law, saying "It is our opinion that in this case the finding of the trial court is based upon undisputed evidence and therefore such finding is essentially a conclusion of law."

This court has not held that in every case involving undisputed evidence, findings of fact become conclusions of law. This court has said that where the evidence is undisputed and "but one inference can be reasonably drawn therefrom, a question of law is presented." *Cutler-Hammer, Inc. v. Industrial Comm.*, 13 Wis.2d 618, 632, 109 N.W.2d 468 (1961). As Justice CONNOR HANSEN pointed out in *Voc. Tech. & Adult Ed. Dist. 13 v. ILHR Dept.*, 76 Wis.2d 230, 239–240, 251 N.W.2d 41 (1977), where the evidentiary facts are not in dispute but permit different inferences, the drawing of one of such inferences is a finding of fact. *See also, Universal Foundry Co. v. ILHR Dept.*, 86 Wis.2d 582, 589, 273 N.W.2d 324 (1979); *Sauerwein v. ILHR Dept.*, 82 Wis.2d 294, 299, 262 N.W.2d 126 (1978); *Milwaukee Co. v. ILHR Dept.*, 48 Wis.2d 392, 399, 180 N.W.2d 513 (1970); *Liebmann Packing Co. v. Industrial Comm.*, 27 Wis.2d 335, 339, 134 N.W.2d 458 (1965); *Cheese v. Industrial Comm.*, 21 Wis.2d 8, 15, 123 N.W.2d 553 (1963).

Chief Justice HALLOWS, writing for the court, explained that " 'As a matter of law' merely means no other factual finding could be reasonably drawn from the evidentiary facts." *Kress Packing Co. v. Kottwitz*, 61 Wis. 2d 175, 179, 212 N.W.2d 97 (1973).

Stating this rule in another way, this court has said:

"30. That this court can read into and can find in this case this was deliberately done by Shopko so as to permit Mr. Compton to be included in the executive bonus plan that might be payable at the end of the fiscal year 1974–75. And I so find."

"Inferences to be drawn from the evidence are functions of the trial court. The drawing of reasonable inferences from the evidence presented constitutes part of the function of fact finding which is vested in the court or in the jury. The credibility of witnesses and the weight to be given to testimony are within the province of the trier of facts. Where testimony is not in dispute as in the instant case, but permits the drawing of different inferences therefrom, the drawing of such permissible inferences is an act of fact finding." *Estate of Brandenburg,* 13 Wis.2d 217, 225, 108 N.W.2d 374 (1961).

*See also, Estate of Beale,* 15 Wis.2d 546, 556, 113 N.W.2d 380 (1962) ; *Ivers & Pond Piano Co. v. Peckham,* 29 Wis. 2d 364, 371, 139 N.W.2d 57 (1966) ; *Klein-Dickert Oshkosh, Inc. v. Frontier Mortgage Corp.,* 93 Wis.2d 660, 287 N.W.2d 742 (1980).

The cases cited by the majority do not support its statement that when the trial court's finding is based upon undisputed evidence, the finding becomes a conclusion of law and this court is not bound by a finding of the trial court. The *Teledyne Case,* 65 Wis.2d 557, 566, 223 N.W.2d 586 (1974), cited by the majority, involved judicial review of an administrative agency decision which applied the law to a particular fact situation. The application of the law to a fact situation has typically been labeled a question of law. *See Nottleson v. ILHR Dept.,* 94 Wis.2d 106, 287 N.W.2d 763 (1980). In the *Browndale Case,* 60 Wis.2d 182, 199, 208 N.W.2d 121 (1973), *cert. denied,* 416 U.S. 936 (1974), also cited by the majority, this court concluded that the case turned on the interpretation of an ordinance. Interpretation of a legislative enactment is conceded to be a question of law. The *WXIX Case,* 38 Wis.2d 278, 281, 156 N.W.2d 451 (1968), cited by the majority, relies on the *Boutelle Case* (also cited by the majority), 34 Wis.2d 665, 673, 150 N.W.2d 486 (1967), which in turn cites *Vogt, Inc. v. International Brotherhood,* 270 Wis. 315, 321i, 71 N.W.2d 359, 74 N.W.2d 749 (1955). In *Vogt* this court care-

fully discussed the difference between questions of fact and questions of law. The *Vogt* opinion makes it clear that a question of law is presented when the facts are undisputed and only one inference can be drawn.[4] The court also concluded that a question of law is presented if the court is construing a written instrument or written pleadings and affidavits on which no parol testimony was heard. 270 Wis. at 321j. In those circumstances the appellate court need not rely on the trial court because both the trial court and appellate court can look at the documents; the appellate court need not defer to the trial court because the trial court had no opportunity to observe the witnesses. In the *Boutelle* and the *WXIX* cases a contract was being interpreted; in *Vogt,* pleadings and affidavits were being interpreted. Interpretation of a legal document in which there is no ambiguity requiring introduction of extrinsic evidence raises questions of law. *Edlin v. Soderstrom,* 83 Wis.2d 58, 69, 264 N.W.2d 275 (1978).

In the instant case the court is not dealing with a question of law, such as construing legislation or a written document or applying the law to the facts. The court is determining whether the employer intended the payment of severance pay to extend the employment to February 22, 1975.

There are a few cases not cited in the majority opinion in which this court has said that where the material facts upon which the issue must be resolved are not in dispute this court does "not consider . . . [that] the finding of the trial court is so conclusive as it is in cases

---

[4] "We are of the opinion that the court should have made the finding requested by the plaintiff, and that, since the facts as to which the request was made are undisputed and the inferences are only one way, we should reverse for error in so refusing. 5 C. J. S., Appeal and Error, p. 802, sec. 1675. If, however, we may not do that, we are at liberty to and should supply the finding." *Vogt, Inc. v. International Brotherhood,* 270 Wis. at 321i.

where there is a clear conflict of evidence. *Weigell v. Gregg* (1915), 161 Wis. 413, [416], 154 N.W. 645." *Saylor v. Marshall & Ilsley Bank,* 224 Wis. 511, 517, 272 N.W. 369 (1937). *See also, General Automotive Mfg. Co. v. Singer,* 19 Wis.2d 528, 530, 120 N.W.2d 659 (1963). However in these cases this court reviewed the trial court's findings to determine whether the findings were reasonably deduced from the evidence. The majority opinion does not, and cannot, conclude that the trial court's findings in the case at bar are not reasonable.

I conclude that more than one reasonable inference may be drawn from the documents and the testimony regarding the termination of employment and the severance pay. I would hold that the question presented in the case, *i.e.,* the date on which the employment was terminated for purposes of payment of the bonus, is a question of fact for the trier of fact who saw and heard the witnesses and questioned them. Because the trial court's findings of fact are reasonable and are not against the great weight and clear preponderance of the evidence, I would affirm the judgment of the trial court.